MAUDIE BRICKER v. CITY OF TROY, Appellant.

Division One, July 30, 1926.

1. **NEGLIGENCE: Electric Current: Continued Operation.** Continued operation of an electric light plant by defendant, after it knows, or by the exercise of ordinary care should know, that the current it is generating is going out in dangerous quantities over the wires of a telephone company, is negligence.

2. ———: **Contributory: Knowledge: Electric Wire.** Negligence cannot be attributed to a householder unless he had knowledge, actual or implied, of the condition of the uninsulated electrical telephone wire which entered his house and of the consequences of taking hold of it with his hand, for the purpose of detaching it, when the telephone bells continued to ring and sparks and flame and smoke issued from the box.

3. ———: ———: **Dangerous Electric Wire: Common Knowledge: Question for Jury.** Where the evidence shows that the bells of the telephone in deceased's farm house began to ring and continued to ring with a loud buzzing noise and that sparks and flame and smoke issued from the box; that he was greatly mystified and alarmed thereat; that the uninsulated wire entered the house from the porch and was tied around an insulator suspended from a bracket seven or eight feet from the ground; that fearing that the house would be destroyed by fire and believing his wife and children were in imminent peril, he stepped out on the porch and on to the ground, seized the wire for the purpose of detaching it, and was immediately killed; that he had no actual knowledge of what caused the telephone bells to ring and the flame and smoke to issue therefrom, and that he possessed no special knowledge of the manifestations and characteristics of electrical currents, it cannot be held as a matter of common knowledge that he was bound to know from what he observed that the wire was charged with an electrical current of sufficient voltage to kill or seriously injure him if he took hold of it, but it was for the jury to say whether under such circumstances a man of ordinary care and caution would have acted as he did, and this notwithstanding it may be true that neither his wife or children nor his property were in the slightest danger.

4. ———: ———: **Instruction: Omission of Pleaded Knowledge: Element of Defense.** Where the petition alleged that deceased while in the exercise of ordinary care "and without any notice or knowledge that the telephone wire leading into his residence was charged with a high voltage of electricity sufficient to kill or injure him" took hold of said wire, etc., an instruction covering the whole case for plaintiff, which does not require the jury to find that deceased took hold of the wire without any notice or knowledge that it was charged with a high voltage of electricity, is not erroneous. Lack of notice or knowledge is not an element of the cause of action, but if said allegation were wholly omitted the petition would not only state a cause of action, but precisely the same cause of action, and the omission relates solely to the defense of contributory negligence.

5. ———: **Ordinary Care: Apprehension: Instruction.** Where the evidence induces the belief that the cause and possible consequences of the sparks, flame and smoke which were issuing from the telephone box were not comprehended by deceased, but that they aroused in him an undefined fear for the safety of both his family and property, an instruction telling the jury that if deceased apprehended immediate danger to himself and family, and that in attempting to escape said peril and without time for deliberation

he seized hold of the uninsulated wire for the purpose of disconnecting it from the box, such facts may be considered in determining whether he exercised ordinary care, is not error, but is within scope of the evidence, and in this case is within the scope of the pleadings.

Corpus Juris-Cyc. References: **Electricity**, 20 C. J., Section 54, p. 375, n. 53; Section 66 p. 387, n. 54; p. 388, n. 56; Section 67, p. 390, n. 75; p. 391, n. 78; Section 68, p. 394, n. 94; Section 69, p. 397, n. 6.

Appeal from Hannibal Court of Common Pleas.—*Hon. Charles T. Hays*, Judge.

AFFIRMED.

*Frank Howell, Berryman Henwood, Rendlen & White* and *Creech & Penn* for appellants.

(1) Instruction 3 did not require the jury to find the facts alleged in the petition. It did not require the jury to find that the deceased took hold of the wire with his hand without any notice or knowledge on his part that said wire was charged with a high voltage of electricity sufficient to kill or injure him. It thereby narrowed the issues made by the pleadings. The issues made by the pleadings must not be broadened or narrowed by the instructions. (a) As to the necessity of avoiding contributory negligence by the petition see: 29 Cyc. 575, 576; Bassett v. Tel. Co., 48 Mo. App. 568. (b) As to instructing on the allegations of the petition, see: Karte v. Mfg. Co., 247 S. W. 417; Compton v. Railroad, 147 Mo. App. 414; State ex rel. v. Ellison, 270 Mo. 645; Degonia v. Railroad, 224 Mo. 564; Scrivner v. Railroad, 260 Mo. 421; Riley v. City of Independence, 258 Mo. 671; Walquist v. Railway, 292 Mo. 34; Kuhlman v. Water Co., 271 S. W. 797. (2) The allegations of the petition or the evidence adduced did not authorize the giving of Instruction 7: (a) There was no evidence in the case tending to show that decedent took hold of the wire at a time of sudden and imminent peril to himself or members of his family without time to reflect or deliberate; and without such evidence on which to predicate such instruction it had no place in the case. (b) The petition does not plead that decedent took hold of the wire at a time of impending danger to himself or members of his family without time to reflect or deliberate, so that this instruction submitted an issue to the jury not raised by the pleadings, and thereby broadened the issues formed by the pleading, and is universally condemned as error, by this, and all our appellate courts. See cases above. (c) The rules of law which permit a recovery by one who acts to his hurt on apparent imminent peril are, as classified by this court: (1) the peril must have been caused

by the negligence of the one against whom indemnity is sought; (2) the apprehension of peril from the standpoint of the injured person must have been reasonable, and (3) the appearance of danger must have been imminent, leaving no time for deliberation. The facts in evidence do not bring decedent within the above classification. Kleiber v. Railway, 107 Mo. 240; Stanley v. Helen, 204 Mo. App. 159; Delfasse v. Railways, 201 S. W. 860; Ephland v. Railway, 137 Mo. 187; Moore v. Railways, 189 Mo. App. 555; Agnew v. Railways, 178 Mo. 119. (d) In any event, it was error to give this instruction separately, for the essentials to liability are the essential elements of plaintiff's case, and ought to be embraced within the main instruction which directs a verdict. These elements are lacking in Instruction 3, which directs a verdict. Delfasse v. Railways, 201 S. W. 860. (e) The evidence reveals that the deceased voluntarily took hold of the wire, knowing it was charged with a high voltage of electricity, when he could have avoided the injury by taking his family out of the house. 29 Cyc. 502; Smith v. Mills, 238 S. W. 573; Myers v. Railway, 103 Mo. App. 268; Moore v. Railroad, 146 Mo. 572; Smith v. Box Co., 193 Mo. 715; Woodson v. Railway, 224 Mo. 685; Smotherman v. Railroad, 29 Mo. App. 265; Fusselman v. Railroad, 139 Mo. App. 198; Wheeler v. Wall, 157 Mo. App. 38; Nivert v. Railway, 232 Mo. 591; Collett v. Kuhlman, 243 Mo. 643; Carroll v. Transit Co., 107 Mo. 653; Gabriel v. Railroad, 135 Mo. App. 222. (f) There was no evidence that deceased's family was in actual danger at the time he took hold of the wire, and there was no evidence that the negligence after deceased started to the rescue was different from that toward his family. No such hypothetical facts were embodied in the instruction, and the instruction was, therefore erroneous and prejudicial to defendant. Donahue v. Railway, 83 Mo. 560; Eversole v. Railway, 249 Mo. 52. (g) There was no emergency or sudden peril in the case to excuse the contributory negligence of deceased. The continued ringing of the telephone bell and sparks and flame coming from the telephone box had been warning deceased for quite a while of the danger, prior to the time he took hold of the wire. Hall v. Railway, 240 S. W. 175. (3) The defendant's demurrer to the evidence should have been sustained, for there were two or more possible causes for a high voltage of electrical current to be on the wire that killed Finten Bricker, and the jury should not have been permitted to conjecture or guess as to the cause. Byerly v. Light & Power Co., 130 Mo. App. 603; Robers v. Packing Co., 180 Mo. App. 227; Weber v. Milling Co., 242 S. W. 985; Purcell v. Tennent Shoe Co., 187 Mo. 276; Rogers v. Packing Co., 167 Mo. App. 58; Goransson v. Mfg. Co., 186 Mo. 300; Epperson v. Tel. Co., 155 Mo. 382; Dyer v. Contr. Co., 258 S. W. 48. (4) As a further reason why the case should not have been submitted to the jury, and the

court erred in submitting the case to the jury, is that, the evidence in the case is wholly insufficient to sustain the verdict, for the reason, that Bricker's death was not shown to have been caused by the negligence of defendant by any positive or direct testimony, but had to be established by inference piled on inference alone, and it is not permissible that a presumption may be based on a presumption, nor an inference upon an inference to support a verdict. Wright v. Ins. Co., 188 Mo. App. 457; Hamilton v. Ry. Co., 250 Mo. 715; Swearinger v. Ry. Co., 221 Mo. 644; Yarnell v. Ry. Co., 113 Mo. 579; Glick v. Ry. Co., 57 Mo. App. 97; State v. Lackland, 136 Mo. 26; State ex rel. v. Cox, 298 Mo. 427; Swartz v. Frank, 183 Mo. 438; Hays v. Hogan, 273 Mo. 1. (5) A still further reason why the defendant's demurrer should have been sustained, is that, the plaintiff's deceased husband was so plainly guilty of negligence contributing directly to his death that it precludes her recovery in this action. Shuck v. Realty Co., 201 S. W. 559; Smith v. Box Co., 193 Mo. 715; Doerr v. Brewing Assn., 176 Mo. 547; George v. Mfg. Co., 159 Mo. 333; Nugent v. Milling Co., 131 Mo. 241.

*Eby & Hulse, D. E. Killam* and *Emil P. Rosenberger* for respondent.

(1) The plaintiff was not required to prove the defendant's negligence or that such negligence was the proximate cause of the death of her husband by direct evidence. She was entitled to prove the primary fact of negligence and proximate cause of death by circumstantial evidence alone. Settle v. Railroad Co., 127 Mo. 336; Cambron v. Ry. Co., 165 Mo. 543; Longree v. Mfg. Co., 120 Mo. App. 478. (2) It was negligence *per se* to operate the light plant and run it, after it had been shut down, for ten, fifteen or twenty minutes to let the people out of the picture show when both the engineer and the manager and superintendent of the plant knew there was trouble on the lines. Harrison v. Electric Light Co., 195 Mo. 606; Kidd v. Light & Power Co., 239 S. W. 586. (3) Plaintiff made out a case to go to the jury. The use of electricity for commercial purposes involves the exercise of the utmost care to protect others rightfully within the sphere of its deadly action from injury thereby. Campbell v. United Rys. Co., 243 Mo. 141; Hickman v. Electric Light & Power Co., 226 S. W. 573. (4) Plaintiff need neither plead nor prove that he was without fault, for contributory negligence is an affirmative defense, and an instruction for plaintiff designed to cover the whole case is not defective nor erroneous if it does not include the defense of contributory negligence. Petty v. Railroad, 88 Mo. 306; Hudson v. Ry. Co., 101 Mo. 29; Young v. Iron Co., 103 Mo. 324; Meily v. Railroad, 215 Mo. 567; Karte v. Mfg. Co., 247 S. W. 417. (5) De-

cedent's husband was not guilty of contributory negligence as a matter of law. Whether he was guilty of contributory negligence was a question for the jury. When suddenly confronted with an unexpected and appalling danger persons do not usually, and the law does not require them, to act instantly and in the most intelligent way to avert or extricate themselves from peril. Temple Electric Co. v. Halliburton, 136 S. W. 584; Caglione v. Electric Light Co., 67 N. Y. Supp. 660; Leavenworth Coal Co. v. Ratchford, 48 Pac. 927; Walters v. Electric Light Co., 54 Pac. 960; Whiteworth v. Belt Ry. Co., 36 So. 414; Dillon v. Light Co., 36 Atl. 164; Walters v. Power Co., 84 S. E. 617. (6) Instruction 7 on imminent danger correctly stated the law as applicable to the facts. Kleiber v. Ry. Co., 107 Mo. 240; Bishop v. Ry. Co., 121 Mo. 216; Sweigert v. Lusk, 196 Mo. App. 480; Strack v. Gen. Baking Co., 223 S. W. 94. (7) Instruction 7 is free from defendant's criticism. It did not tell the jury that if they found certain facts to be true then they should find decedent Bricker not guilty of contributory negligence; it merely told the jury that they might take into consideration certain facts in passing upon the question of his contributory negligence. Lange v. Mo. Pac. Ry. Co., 208 Mo. 458. (8) If instructions taken as a whole present the issues fairly and are not misleading and are not calculated to mislead the jury that is all that is necessary. Henry v. Railway Co., 113 Mo. 525.

RAGLAND, P. J.—Action for wrongful death. The cause was tried in the Hannibal Court of Common Pleas, to which it was removed on change of venue from the Circuit Court of Lincoln County. A general outline of the facts will suffice for an understanding of the legal questions involved.

At the time of the occurrences about to be narrated Troy was a city of the fourth class, having a population of about 1100. It owned and operated an electric light and power plant, through and by means of which it lighted its streets and furnished its inhabitants with current for power and lighting, and for which it charged and received compensation. The plant generated an alternating current of 2300 volts. This current was carried on primary wires which were stretched along certain streets of the city; here and there it was "stepped down" to 110 volts by means of transformers and from thence conveyed by secondary wires to consumers. In addition to these primary and secondary wires, and not connected with them, there was a wire which went out from the plant and returned after making a circuit. This wire carried the current which operated the street lights, in a series; it was approximately of 1250 volts. The system employed for the distribution of electric current approximately ten miles of wire, which was strung on poles along and

across the streets and alleys of the city. Occupying the same streets and alleys, and in the same way, were the wires of the Troy Telephone Company, who operated in the city of Troy a local telephone exchange. Extending from Troy north and northwest for several miles out into the country there were eight or ten "farmers' lines" of telephone. These lines were not owned by the Troy Telephone Company, but they took charge of the lines at the city limits, carried them to the switch board of their central exchange and through that exchange furnished the owners of the farmers' lines with the same service that was given their town subscribers. The farmers' lines, mechanically, constituted parts of the plant of the Troy Telephone Company. On some of the streets the light wires and the telephone wires were carried on opposite sides; on others they were strung on the same poles, the light wires being on separate cross-arms and above the telephone wires. At street corners where the wires crossed, in some instances the light wires were above, and in others below, the telephone wires. The telephone wires were uninsulated; the light wires were insulated, but it had been observed that in some places the insulation was badly worn and in others entirely off. No recent inspection of the wires had been made for the purpose of determining the condition of the insulation. One Dyer was the superintendent in charge of operation of the light plant; Wombles was the engineer, and Hopkins the electrician and "trouble shooter;" it was the latter's duty to look after the wires and remedy any situation that prevented them from functioning properly in the transmission of the current.

On July 7, 1921, at about 7:30 P. M. a severe electrical storm accompanied by wind and rain broke over the city of Troy. At the end of approximately a half hour the force of the storm had spent itself; but the rain, with some wind and intermittent flashes of lightning, continued for a half or three-quarters of an hour longer. On that day the light plant started up at six o'clock P. M., but the current was not turned on the street light circuit at any time during the evening or night. The plant continued in operation without anything unusual occurring until shortly before eight o'clock, when the switch board indicated trouble out on the lines. It showed an increasing amperage and a lowering of the voltage. The lights became dim and flickered from time to time; these conditions indicated to Wombles, who was in charge of the power house, that there was a short circuit, or a "ground" of the current. About that time Hopkin's attention was called to a live electric light wire that was lying across the street near the telephone exchange building. It was a street light wire which had come in contact with a primary wire and burned in two. One end had fallen to the ground. At approximately the same time a local resident in another part

of town discovering that the telephone wire which came into his house was heavily charged with a current of electricity cut it just outside the house.  The wire after it had fallen to the ground began burning the wet grass and other vegetation and continued to do so until it was removed.  Dyer was the operator of the moving picture machine in a local play house, and was engaged as such when these wire troubles developed.  The condition of the telephone wire just referred to was communicated to him and he thereupon announced to those in attendance at the picture show that the lights would be off for a short time until trouble on the lines could be rectified, directed Hopkins to go to the power house and have the engineer cut the current off and then meet him at the place where the live telephone wire was.  This was done.  After the wire just mentioned had been removed, Dyer and Hopkins went to the plant and the former started the machinery again.  The switch board showed that the trouble on the lines had not been removed.  Dyer then directed Wombles to keep the plant running for fifteen or twenty minutes, and then close down for the night.  In the meantime he returned to the picture show and announced that the evening's entertainment was at an end.

Finton Bricker with his family, which consisted of his wife (the plaintiff in this case) and two small children, resided on a farm some three and a half or four miles northwest of Troy.  In his residence there was a phone which was connected by means of one of the farmers' lines, known as ''238,'' with the central exchange of the Troy Telephone Company.  There was no storm in the vicinity of the Bricker home, some clouds and occasional flashes of lightning could be observed at a distance in the southeast, nothing more. Shortly before eight o'clock (the times of the happenings of the events narrated were all approximated by the witnesses) the bells on the phone in Bricker's house commenced a continuous, loud, harsh ringing.  Mrs. Bricker took down the receiver and endeavored to respond to what she supposed was a call.  She heard only a loud buzzing noise similar to that made by an electric fan.  The ringing of the bells continued.  Bricker, thinking that some one was trying to call them on an urgent matter, went to a near-by neighbor's to try his phone.  Soon after he left the phone ceased ringing.  Shortly after his return, and after a cessation of about fifteen minutes, the phone bells again began to ring, this time more violently than before.  The ringing continued without intermission; sparks and flame and smoke issued from the box.  Plaintiff's evidence disclosed that there were eleven other telephones on the farmers' lines which exhibited the same phenomena as Bricker's, and at the same time; that is, the bells rang continuously for an interval, ceased for about fifteen minutes and then recommenced with greater violence, with

an accompaniment of sparks and flames from the boxes. There was a house in Troy equipped with electric lights, an electric fan and a telephone. Immediately after the storm had passed over the town the owner began having trouble with his phone and lights. The lights would come and go; in every instance when the lights came on the fan immediately started running and the telephone bells began ringing. As long as the lights remained on the bells continued to ring; when the lights would go off the fan would stop and the bells cease ringing.

As to what was said by Bricker and his wife when their telephone began ringing the second time, as indicating the apprehension which it caused them, we quote from the plaintiff's testimony as follows:

"He looked in the kitchen and in the room where the telephone box was. He says, 'Oh! there is something wrong with the box.' He says, 'There is fire coming out of the box,' and we got up and the children got up too. I could see flames in the kitchen come out and light the room, the room was dark. To the best of my knowledge the flames came out of the telephone where the little bells are, the bell at the top of the box. I was scared. They came out of the box, that is as near as I can honestly tell, seemed to me like they came out up there. The telephone bell was ringing when my husband was in the act of retiring, the ringing was harsh all of the time, and as though an electric fan, had that awful noise to it. My husband said, 'Oh! What would we do?' I said, 'I don't know what to do.' He said 'Take the children, get out of the house, he would run to the barn and get the pinchers.' He thought the house would catch fire. He said, 'For me to take the children,' first he said, 'Light the lamp,' he said, 'Now you take the children and get out of the house, I will run to the barn and get the pinchers,' I says, 'No, I will get them,' he says, 'No, I know where they are, he had them shoeing a horse at noon,' he said, 'Knew where they were and run to get them.'"

Being asked further whether she cautioned her husband about trying to disconnect the telephone, she further testified:

"A. Well, I said to him 'That I would not go about the 'phone.' I felt maybe that he ought not to do it. He said, 'No, if I don't the house will burn and the barn and the hay and everything we have got and we will have nothing.'

"Q. At that time, did you know that this wire leading to your house had a large current, that it was carrying a larger current of electricity? A. I did not. . . . . I did not know. I just felt like I did not want him to bother it."

There was a porch in front of Bricker's house, the south side; the telephone line entered on the west side not far from the porch; it was tied around an insulator which was suspended from a bracket seven or eight feet from the ground. When Bricker came out on

the porch, ostensibly to go to the barn, he was in his bare feet; he evidently did not go to the barn, but stepped out on the ground, took hold of the telephone wire with his left hand and endeavored to pull it loose from the house. For almost as soon as he had gotten outside his wife heard him exclaim, ''Oh!'' She immediately went out and saw him swaying to and fro with his hands up; he fell across a pile of wood, the wire grasped in his left hand. Mrs. Bricker repeatedly tried to take hold of him and lift him up but was prevented from doing so by the shocks which she received. After the exclamation made soon after he had gone out Bricker never uttered another word. His body showed a deep burn in the left hand, burns on his left ear and shoulder and on one of his legs.

In addition to the evidence which tended to show the foregoing, plaintiff called experts who gave it as their opinion that the condition of the telephone wires, in respect to being charged with a high voltage current of electricity, could not have been caused by lightning, but was caused through contact of the telephone wires with wires carrying an artificially generated current.

Defendant's evidence tended to show that the storm was more severe and lasted for a longer period of time than as testified by plaintiff's witnesses; that it was in fact unprecedented, particularly with reference to the electrical display, which was described as practically continuous throughout the storm and until it had fully spent itself Defendant's experts testified that in their opinion the phenomena exhibited by the telephones and wires, heretofore described, could have been caused solely by lightning. There was further evidence on the part of defendant that the wires of both the lighting plant and the telephone exchange were carefully inspected on the morning after the storm and nothing was found which in any way indicated that the wires of the two systems had come in contact during the storm or afterward.

The alleged negligence on which the action is based is set forth in the petition as follows:

''That said telephone box (the one in the Bricker house) was connected with a certain telephone wire that led to the city of Troy, . . . and that said wire ordinarily was harmless and ordinarily did not contain a sufficient voltage of electricity to hurt or injure or kill any one who touched or took hold of the same with his hands or hand for any purpose whatever. . . .

''That on the 7th day of July, 1921, plaintiff's said husband, Finton Bricker, while in the exercise of ordinary care on his part *and without any notice or knowledge on his part that the telephone wire leading into his residence and to his box was charged with a high voltage of electricity sufficient to kill or injure him* took hold of said wire on his own premises at a point of approximately ten feet

from where the wire was attached to plaintiff's husband's house with one of his hands for the purpose of disconnecting said wire from his residence and was then and there instantly electrocuted and killed, and that the death of plaintiff's husband was directly caused by the negligence of the defendant city . . . in this, to-wit: that the said city negligently operated its said electric light plant and wires in the said city of Troy on the 7th day of July, 1921, after it knew, or by the exercise of ordinary care could have known, that some of its electric light wires were not properly insulated, and were crossed, and had come in contact with certain uninsulated telephone wires belonging to and operated and maintained by the Troy Telephone Company, and that the said city negligently charged its said wires with a heavy voltage of electricity, to-wit: a voltage of sufficient force to cause instant death to anyone coming in contact with any of its electric light wires, or any of the telephone wires of the Troy Telephone Company which were crossed with and were in contact with the city wires or any of the wires of the Farmers' Telephone Company that were connected with the wires of the defendant Telephone Company as herein stated, and that the said city knew, or by the exercise of ordinary care could have known, that its said electric light wires were crossed with and had come in contact with the wires of the Troy Telephone Company in time by the exercise of ordinary care to have repaired said electric light wires, and to have averted the accident to plaintiff's husband herein complained of, but that said city negligently failed to repair its electric light wires."

The answer consisted of a general denial coupled with pleas: (1) that the deceased's negligence was the sole cause of his injury and death; (2) that his negligence contributed thereto; and (3) that his death was due solely to an act of God.

Plaintiff's principal instruction, numbered 3, which directed a verdict for plaintiff upon an affirmative finding of the facts therein hypothesized, followed closely the allegations of the petition, omitting, however, the one italicized above. Plaintiff's Instruction 7, after an introductory statement, "that the law does not require persons when confronted with unexpected and apparently imminent danger to act instantly and in the most intelligent way to avert or extricate themselves from the peril," told the jury: that if they found from the evidence that the telephone box had become heavily charged with a high voltage of electricity, causing sparks and flame to be emitted from said box, and thereby exposing said Bricker and his wife and children to an apparently imminent peril; that the appearance of danger was imminent, leaving no time for deliberation; that by reason of the situation in which he was then and there placed Bricker apprehended immediate danger to himself and his said family; that

his apprehension of danger was from his standpoint reasonable; that in attempting to escape said peril and without time for deliberation he met his death by adopting a dangerous alternative for removing said danger; and that said danger was caused and brought about by the negligence of defendant, as explained in plaintiff's Instruction 3—then the said conduct and acts of said Bricker in so attempting to remove said impending danger and peril might be considered by them in connection with all the evidence in the case in determining, under the instructions, as to whether or not he exercised ordinary care in the premises. Other instructions, in connection with those just noted, covered every phase of the case. The jury returned a verdict for plaintiff assessing her damages at $10,000. From the judgment rendered thereon defendant prosecutes this appeal.

Appellant assigns as error: (I) The refusal of an instruction in the nature of a demurrer to the evidence asked by defendant at the close of the case; (II) the giving of plaintiff's Instruction 3; and (III) the giving of plaintiff's Instruction 7.

I. It is claimed that the demurrer to the evidence should have been sustained for these reasons: (1) that a finding of defendant's negligence thereunder would be necessarily a matter of con-

**Demurrer to Evidence.** jecture, because it could be reached only by basing inference upon inference; (2) that the evidence disclosed that the condition of the wire which killed Bricker could have resulted from any one of a number of causes; and (3) that it showed that the deceased was guilty of contributory negligence as a matter of law. With reference to (1) and (2) we do not deem it necessary to follow the refinements of reasoning employed by counsel in their argument and analysis of the evidence. A consideration of certain outstanding facts, well supported by the proof, will, we think, suffice to show that a case was made for the jury.

During the progress of the storm the indicators on the board at defendant's power house showed unmistakably that the electric current there being generated was escaping from the circuit or circuits comprised within its system of wires. At the same time the telephone wires, both those constituting the farmers' lines and those in town, were being charged with a current of electricity of high voltage. That current was continuous, in that respect like those which are artificially generated, and unlike those which "lightning" ordinarily causes. When the machinery of the light plant shut down the first time, the telephone bells quit ringing—the high voltage current of electricity ceased to flow out over the lines; when the generator at the plant was started again, the telephone wires again became heavily charged. It is true that no witness was able to tell the exact time—hour, minute and second—when the light plant first shut down, or

when it started up again, or when the telephone bells on the farmers' lines ceased ringing the first time, or when they recommenced. But the time when the lights were first cut off and the time when the phones first quit ringing, as approximated by the witness, was the same. And the same is true with respect to the time when the lights were again turned on and the time when the telephones renewed their ringing. In one home equipped with both lights and phone it was observed that when the lights came on the telephone began ringing and rang continuously as long as the lights burned, but that the instant that the lights went off the bells ceased ringing. These phenomena repeated themselves a number of times and, in the absence of any other explanation, seem conclusive proof that the current which caused the lights to burn and the current which caused the telephones to ring came from one and the same source.

After the superintendent of the light plant had visited the place where the "live" telephone wire was located and the wire had been cut off and removed he went to the power house and started the machinery again. He immediately saw that the current was escaping from the light wires and he had good reason to believe that it was flowing out over the telephone wires. Notwithstanding, without making further investigation or inquiry, he kept the plant going for a period of fifteen or twenty minutes thereafter in order to accommodate the patrons of the moving picture show. The gist of the negligence charged is the continued operation of the light plant by defendant after it knew, or by the exercise of ordinary care should have known, that the current it was generating was going out over the wires of the telephone system. Who brought that condition about, or what brought it about, is not of the slightest consequence.

Bricker's alleged negligence presents the serious question in the case. Fault on that score, however, cannot be attributed to him unless he had knowledge, actual or implied, of the condition of the wire and of the consequences of taking hold of it with his hand. The evidence tends to show **Contributory Negligence.** that he had no actual knowledge of what caused the telephone bells to ring and sparks and flame and smoke to issue from the box, but on the contrary was greatly mystified and alarmed thereat. There were no light wires coming into his house, nor were there any in its vicinity. He did not know that an electrical storm was in progress anywhere; and it does not appear that he knew anything about the locations, with respect to each other, of the wires of the telephone and light systems at Troy, and the possibility of their coming in contact. It was not shown that he possessed any special knowledge of the manifestations and characteristics of electrical currents; the evidence disclosed merely that he was thirty-three years of age and a farmer by occupation. We are unable to say that as a matter of common

knowledge he was bound to know from what he observed that the telephone wire was charged with an electrical current of sufficient voltage to kill or seriously injure him if he took hold of it. As to Mrs. Bricker, she did not know that the wire was heavily charged with electricity; she did not know what was wrong; the actions of the telephone merely induced in her an instinctive fear.

It may be suggested that Bricker by the simple process of elimination must have known that the telephone wire was charged with electricity, nothing else could have caused the phenomena displayed by the phone; that from the violence of the ringing and the issuance of smoke and flame, he must also have known that the wire was heavily charged; and consequently that to take hold of it with his hand was an exceedingly dangerous thing to do. Had he taken time to reflect he no doubt would have reached that conclusion. But he did not stop to reason about the matter. The evidence tends to show that he not only believed that his wife and children were in peril, but that all of his property was in imminent danger of being destroyed by fire; that in order to avert these threatened dangers, he conceived that the telephone wire must be immediately disconnected from the house; and that with that one thought dominating him he started from the house to go to the barn for an appliance with which to cut the wire, but on an apparent impulse of the moment suddenly turned aside and grasped the wire with his hand in an endeavor to pull it loose. It may be true, as asserted by appellant's counsel, that neither Bricker's wife and children nor his property were in the slightest danger, still it cannot be said as a matter of law that his apprehensions, judged from the situation as it appeared to him, were unreasonable. It was for the jury to say whether under such circumstances a man of ordinary care and caution would have acted as the deceased did. [Kleiber v. Railway, 107 Mo. 240; Lang v. Railroad, 115 Mo. App. 489.]

II. It is contended that plaintiff's Instruction 3 was erroneous in that it did not require the jury to find, as alleged in the petition, that Bricker took hold of the telephone wire without any notice or knowledge that it was charged with a high voltage of electricity sufficient to kill or injure him. The contention assumes that the lack of such knowledge or notice was an element of the cause of action pleaded. But it is manifest that if the allegation with respect thereto had been wholly omitted the petition would not only state a cause of action, but precisely the same cause of action. The commission of the wrongful act, the manner of its commission and the consequences flowing from it, from the standpoint of the pleading, would in no way be affected by omission of the allegation with respect to notice. Deceased's knowledge or lack of knowledge was a matter

**Instruction: Omission of Element Pleaded.**

going only to the question of whether he himself was negligent. The omission from plaintiff's instruction of this matter relating solely to the defense of contributory negligence was not error, even though the instruction purported to cover the whole case. [Meily v. Railroad, 215 Mo. 567, 587.]

III. Plaintiff's Instruction 7 is vigorously criticized and from many angles. Chiefly, however, on the ground that it was beyond the scope of both pleading and evidence. The conten-

**Imminent Peril: Deliberation.** tion that the instruction was not warranted by the pleadings seems to involve a strange misconception of the cause of action alleged in the petition. It did not operate as a separate and piecemeal submission of facts necessary to complete the making of a case for plaintiff, as appellant seems to think. It was given for no such purpose; it served no such purpose. It dealt only with a phase of the evidence which related solely to the defense of contributory negligence. The purpose of the instruction was narrowly limited by its own terms; it merely told the jury that if they found certain facts to be true, that they might take those facts into consideration, in connection with all the other evidence in the case, in determining whether the deceased at the time he received his injury was himself in the exercise of ordinary care.

In their insistence that the instruction is in conflict with the evidence, appellant's counsel stress Bricker's statement that his house and barn and everything that he had would be burned. He did not apprehend any danger to his wife and children, they say, but he was fearful that his property would be destroyed. A careful consideration of the evidence, which has been set out and for that reason need not be repeated, induces the belief that the cause and possible consequences of the ringing, cracking, flame-emitting telephone were not comprehended by Bricker, but they aroused in him an undefined fear for the safety of both his family and his property; and that the peril he sought to avert was, as he saw it, the peril of both. The thought that all of his property was about to be swept away by an impending conflagration may well have contributed to cause an excited state of mind. And it is by no means clear that the jury could not properly have been instructed to take that fact, if found by them, into consideration in connection with the others mentioned in the instruction, in determining Bricker's care or want of care. Appellant, however, was not prejudiced by the trial court's avoidance of this debatable ground. Other criticisms of the instruction, leveled at its form and grammatical construction, are entirely devoid of merit.

The record as a whole discloses that the cause was carefully tried, and without prejudicial error. The judgment is affirmed.

All concur, except *Graves, J.,* absent.