Thelma LOSH, Respondent,

v.

**OZARK BORDER ELECTRIC COOPERA-TIVE, Appellant.**

No. 47344.

Supreme Court of Missouri,

Division No. 2.

Jan. 11, 1960.

Wangelin & Friedewald, Poplar Bluff, for appellant.

Dalton & Treasure, Kennett, Byron Kearby, Poplar Bluff, for plaintiff (respondent), Thelma Losh.

EAGER, Judge.

Plaintiff, the widow of Woodrow Losh, was awarded a verdict and judgment of $25,000 for the death of her husband, allegedly due to defendant's negligence. Following the overruling of after-trial motions, this appeal was taken. Many of the formalities, as well as some substantive facts, have been stipulated, and the issues have been narrowed.

Decedent (whom we shall refer to as Losh) owned a forty-acre farm five or six miles west of Malden, Missouri, and lived there with his family. He farmed this place, but also worked at the Malden Grain Company more or less regularly. Beginning early in 1957, he took several months off from his work at the Grain Company and, with the help of his nephew, built a new house on his place. These two did substantially all the work themselves except for the electric wiring, which was the cause of the present difficulty. Losh employed Kenneth Stegall of Malden to wire the house at a price of $1 per outlet for his labor, Losh to furnish all material. This work was started around February 1, 1957, when the walls were only partially completed and the roof was being put on; it was completed on or before March 2, except that Stegall went back a day or two later and put in a ground wire which defendant required. Stegall had had no formal training as an electrician, but he had wired "several houses" at Malden; Losh told him where he wanted the various plugs, switches, etc., but did not attempt to supervise his work. During the construction Losh was receiving temporary service from defendant, with the meter attached to a pole. Stegall testified specifically: that a floor furnace had been installed between February 1 and March 2, and that it was burning one day while he was working there; this was located in a hallway just outside the utility room door, and it was being operated from a drop cord extension carried under the floor; that he put in a switch for this furnace on the utility room wall, and more or less behind the door. The wiring of that switch will be discussed later, as it is very material. Stegall was paid $33 by check dated March 2, 1957, which amount included a charge of $1 for the installation of the furnace switch; he installed small wires in a wall for a thermostat; from his testimony it would appear that the thermostat was not connected up at that time.

The plaintiff testified that the floor furnace was installed during February 1957;

an invoice or statement dated 2–15–57 from a store in Malden showed the purchase of a floor furnace, along with other items. Plaintiff also testified: that they moved into the house on March 4 and used the furnace when they needed heat; on these occasions they used an extension cord for current; that there was a switch for the floor furnace, behind the utility room door, and that this was put in "when the rest of the house was wired"; that a thermostat was installed by Stegall in the living room; when they moved in the lights were working satisfactorily; that she never had occasion to turn the furnace switch on or off. Plaintiff worked at a garment factory in Malden and last saw her husband at noon on September 18, 1957, when he had lunch with her in town.

Omitting many details of the evidence, we note that Losh was found dead on the night of September 18, 1957, lying on the damp ground under his house near the floor furnace, with his hands clasped on a pair of pliers or wire cutters, which, in turn, were in a cutting position on the wire in a "Romax" cable. It is agreed that Losh died by electrocution; the current in the cable was only 110 volts. This cable had been carried down through the floor as the permanent electrical connection for the furnace; its lower end had been left loose and it was approximately two and one-half feet too long. It is obvious that Losh was attempting to shorten this cable so as to make it fit more readily. The cable consisted of two wires, one covered with black rubber insulation and one with white, with both wires contained in a heavier insulation; it averaged about one-fourth inch in diameter. Losh's hands were burned. He had told his wife that he was going to wrap some water pipes under the house that afternoon.

Defendant's liability rests upon an alleged negligent inspection of the wiring in the house on April 1, 1957, and specifically upon a failure to inspect and test the furnace switch. In this situation, the evidence to show the presence of the switch at that time, as well as the method in which it was wired, is highly material. In addition to the testimony of Stegall and plaintiff, already referred to, Glen Kinder, plaintiff's brother, testified that the furnace was installed in February 1957, and that it was operating when the Loshes moved in, being then hooked up by an extension cord; also, that the furnace switch was installed with the other wiring, and that he had seen it before April 1; that there were 33 outlets in the house in all. Defendant's regular inspector, Alvin M. Woodrum, inspected the wiring on April 1, 1957, prior to the furnishing of regular service, and in accordance with defendant's usual practice; he certified that the wiring conformed to the minimum standards required by defendant (which incorporated those of the National Electrical Wiring Code and certain supplemental requirements). Woodrum testified: that he de-energized the entire house, checked the outside wiring and the breaker box, disconnected all bulbs and appliances, and with a portable meter made a "polarity" test on every outlet, including switches and wall plugs; that if the wiring in an outlet had been improper, there would have been a negative reading on the meter and that he would either have corrected the defect himself or would have ordered it corrected; that this test would determine whether the "hot" or "cold" lead had been wired into a switch. Defendant was paid $4.50 by Losh for this inspection. Woodrum further testified that if a thermostat had been installed it would have shown a resistance observable to him, which was not shown. The gist of his testimony is, so far as we are concerned, that he saw no furnace switch or lead, tested no such switch, and saw no floor furnace. (From this it was argued that the furnace and switch had not been installed at that time.) Woodrum testified initially, in substance, that if such a switch was wired correctly there would be no current beyond the switch when it was "off." This was confirmed by Clarence Berry, another electrician. When recalled by defendant, Woodrum testified that there "could be" some current in the cable beyond the switch

with the circuits in use, even if the switch was operating properly, depending upon "the load that was on the same circuit of the wiring." The explanation of this is somewhat complicated, at least to one naive on the subject of electricity. Kenneth Stegall, who wired the house, was a carpenter in Arkansas at the time of trial. In addition to what has already been related, he testified in part: that he installed the floor furnace switch prior to March 2, and ran the cable leading from the switch under the floor, leaving it free there; that the switch was an ordinary wall switch, covered with a plate, and having an "on" and "off" lever or handle; that a black wire and a white wire came down to this switch from the ceiling in a Romax cable; one was the "hot" wire, and one was the cold or neutral wire (at his deposition he was not sure which was the "hot" one); that in wiring this switch he used the same wire for the "hot" wire as he did in the rest of the house, but that it "could be wired up backwards" and he would not say that "it was or it wasn't"; at another point he testified that he didn't know whether the switch was wired properly, but that a polarity test would determine whether it was or not. He testified further: that he did not check the wiring generally, or this particular switch, after its completion; that he ran wires for a thermostat (but with some possible contradiction as to whether a thermostat was actually installed by him); that if a proper furnace switch was wired correctly and was turned to "off," there would be no current flowing through the switch to the wire beyond. Clarence Berry, an electrician of Malden, came to the scene about 1:00 a. m. on September 19, cut off all current to the house, cut Losh loose and helped pull him out. On the next day, the 20th, he examined the furnace switch, pulling it out of its box. He found: that no part of the "hot" wire had been connected to the switch, but that it simply went "straight through," although it had been cut, soldered together and taped; the solder had not been broken and the tape was dry, not waxy; that the "ground" wire was the one which had been

connected to the switch; that the "hot" lead was "going by the switch," and that there would be electricity all the way to the end of that wire; or, in other words, that there would be current at the point where Losh was trying to cut the wire; that if the switch had been connected into this hot lead, and the switch worked properly, there would have been no current there; that the switch itself seemed to be in good operating condition. The pliers Losh was using were not insulated, and he did not have on rubber gloves. The furnace burned gas, and the purpose of the wiring was to activate a fan or the thermostat, or both. The voltage in this wire was 110, or ordinary household current. This witness testified specifically that a polarity test on this switch would have disclosed that the "hot" lead was not connected to the switch.

With reference to the position of the switch (on or off), we note the following: among the first persons who came to plaintiff's assistance was her brother, Glen Kinder. He testified that he saw Losh under the house, went in the house and "turned off all the switches and in the main circuit breaker box"; he was asked immediately thereafter: "* * * did you observe the floor furnace switch?" He answered: "I did not at the moment, but I did later * * * maybe thirty or forty minutes later" and he further stated that it was then "in the off position." He also said that no one else had entered the house in the meantime. Clarence Berry, the electrician, arrived an hour or so after Kinder, the doctor, and others. As already stated, Berry took further steps to cut off all current to the house, pulling the meter off the pole. At one point, in answer to a leading question, it appears that Berry said that the first thing he did was to "cut every switch he could find," and pull the meter. But when asked if he examined the furnace switch that night, he said: "* * * I didn't. Yes I did. I went to see if it was turned on or off," and that it was "off"; that this was about ten minutes after pulling Losh's body out. The lights in the

house were operating without incident just before Losh's body was found. The Electrical Code referred to provided that "no switch * * * shall disconnect the grounded conductor of a circuit unless the switch * * * simultaneously disconnects the ungrounded conductor * * *." The grounded conductor was shown to be the "cold" or neutral wire, and the ungrounded conductor the "hot" wire.

■ Defendant's points here are: (1) that its motions for a directed verdict should have been sustained, because (a) Losh was guilty of contributory negligence as a matter of law, and (b) that the evidence did not establish defendant's negligence; (2) that there was error in giving plaintiff's Instruction No. 1. It seems more logical to consider 1(b) first. On this counsel argue the evidence without citation of authority. From all the evidence we are convinced that the following matters were jury issues: (1) was the switch defectively wired, with the wires reversed so that the "hot" lead was not broken when the switch was turned "off"; (2) was the switch installed prior to April 1, 1957, and did Woodrum miss it in his inspection; (3) would the defect have been disclosed by a proper inspection; and (4) was the switch "off" when Losh was electrocuted? The jury could not well have found for plaintiff without finding all these issues in her favor. There is some confusion and perhaps a measure of contradiction in the evidence, as in most cases. Counsel argue that Berry and Kinder both testified that they turned this switch (and others) off, and that it must have been "on" when Losh went under the house; when their testimony is analyzed it stands for no such positive statement from either. There was evidence that the first person who looked at this switch (Kinder) found it in the "off" position. We remark here that it would seem unusual to have such a switch in the "on" position when the furnace had not even been connected. Any conflicts or confusion go merely to the weight of the evidence (Caswell v. St. Louis Public Service Co., Mo., 262 S.W.2d 40, 45), plaintiff is entitled to the aspect most favorable to her, and she is not bound by the isolated statement of any one witness if there is other testimony more favorable. The importance of this evidence, of course, lies in Losh's supposed reliance upon the effectiveness of the switch when turned to "off." Stegall's testimony about the wiring, confused in certain respects, indicated that he did not know whether the switch was wired correctly or whether the wires had been reversed. Berry found, almost immediately after the death, that the wires were reversed, that the "hot" wire had not been connected into the switch, and that it carried unbroken current to its terminus when the switch was off. This wire had been cut, soldered together and taped, but it bypassed the switch itself, though apparently in the box. The lapse of five or six months between the completion of the wiring and Berry's examination cannot destroy the effect of his evidence in creating a submissible case. This, again, goes to the weight of the evidence. The circumstances did not fairly indicate that the switch had been tampered with in the meantime, and in any event it is improbable that anyone would change a switch so as to wire it improperly. Also, the wall had been sealed in after the wiring was done. A submissible case was made on the issue of defendant's negligence. We have been unable to discuss some evidentiary points made, but they have been considered and are deemed to be in no way controlling. This includes the arguments, pro and con, about the installation of the thermostat, and the presence of an extension cord under the house with a burned-out light bulb.

■ We consider next the contention that Losh was guilty of contributory negligence as a matter of law in attempting to cut the cable with uninsulated pliers, without rubber gloves, and while lying on the damp ground. On this point, we determine whether reasonable men might reach different conclusions on this evidence, viewed most favorably from plaintiff's standpoint.

Lebow v. Missouri Public Service Co., Mo., 270 S.W.2d 713, 717; Brandt v. Thompson, Mo., 252 S.W.2d 339, 341; Allman v. Yoder, Mo., 325 S.W.2d 472; Nelson v. O'Leary, Mo., 291 S.W.2d 142, 147. We must and do recognize the rule 'that where a person intentionally comes in contact with a charged electric wire, knowing (or having constructive knowledge) of its dangerous character, he is guilty of negligence as a matter of law. Frauenthal v. Laclede Gaslight Co., 67 Mo.App. 1; Junior v. Missouri Electric Light & Power Co., 127 Mo. 79, 29 S.W. 988; Weddle v. Tarkio Electric & Water Co., Mo.App., 230 S.W. 386; 29 C.J.S. Electricity § 66, p. 629. 34 A.L.R.2d pp. 126–127. Defendant cites these cases and texts. In Frauenthal, an intelligent and mature seventeen-year-old boy reached over and grabbed a broken light wire lying in the street after being warned of its dangerous character (merely attempting to shield his hand with a handkerchief), while various other persons were standing back from the wire. In Junior, an experienced lineman, while sitting on a crossarm, attempted to connect other wires to the exposed ends of "live wires" without wearing rubber gloves which he carried in his belt. In those cases contributory negligence was held to exist as a matter of law. In Weddle, the rule of contributory negligence mentioned above was stated, but the facts were held not to establish such negligence as a matter of law. There a lineman testing a telephone line was burned by reason of a contact between the telephone wires and a power line; the evidence indicated that he did not know that this particular power line carried current in the daytime. Defendant also cites Coleman v. North Kansas City Electric Co., Mo., 298 S.W.2d 362, and Hamilton v. Laclede Electric Cooperative, Mo., 294 S.W.2d 11, primarily on the effectiveness of Losh's supposed negligence. The Coleman case involved negligent exposure by an experienced electrician while working on a highly charged substation. In Hamilton, a man and his wife were pulling a pump and well casing out of a well; they raised it 24–25 feet

above the well house roof, and let it lean over approximately twelve feet; it touched uninsulated wires (in plain view) furnishing light and power and running to a transformer pole. The husband had worked for a utility company. These people knew that electricity was dangerous, they had "probably" seen the wires and had walked under them, but they simply paid no attention to them at the time; the plaintiff wife was held to be negligent as a matter of law. None of these cases are controlling here. From the evidence and its legitimate inferences, the jury could reasonably find that Losh was merely attempting to connect the free ends of these wires to his furnace when the switch was "off." The line carried 110 volts, the usual household current, and he and his family had successfully used the electricity and the wiring in the house for other purposes for a period of over five months. A reasonably prudent person might know that damp ground and the absence of insulation would make one a conductor of electricity if he knew, or had reason to know, that the wire at that point was energized. We hold that Losh was not charged with notice of the danger here as a matter of law. The following cases have some applicability, at least by analogy, on the question of knowledge or lack of knowledge of the danger. Gladden v. Missouri Public Service Co., Mo., 277 S.W.2d 510; Atherton v. Kansas City Power & Light Co., 356 Mo. 505, 202 S.W.2d 59, 63; Bricker v. City of Troy, 315 Mo. 353, 287 S.W. 341, 344–345; Blackburn v. Southwest Missouri R. Co., 180 Mo.App. 548, 167 S.W. 457; Sprinkles v. Missouri Public Utilities Co., Mo.App., 183 S.W. 1072, 1075; Thompson v. City of Lamar, 322 Mo. 514, 17 S. W.2d 960; Lebow v. Missouri Public Service Co., Mo., 270 S.W.2d 713. The question of contributory negligence was fully submitted to the jury in two instructions offered by defendant. The Hamilton and Coleman cases, supra, are cited as holding that where the negligent act of a plaintiff is necessary to make a dangerous situation "effective in harm," it is always a contributing factor. We have no doubt of that,

but under our ruling the point becomes immaterial.

The remaining point concerns plaintiff's Instruction No. 1. Defendant says: (1) that it failed to include all necessary elements of plaintiff's case; and (2) that it submitted the issue of "proximate cause" as a conclusion and without any definition. The instruction hypothesized: that Woodrum undertook to make the wiring inspection; that at that time the "hot" lead of the furnace was "unbroken" by the furnace switch, and that the wiring did not comply with the National Electrical Wiring Code; that Woodrum failed to "properly inspect the wiring in the floor furnace lead and switch"; that he failed to warn Losh of the defective wiring; that defendant then negligently energized the house wiring; that the acts of Woodrum and defendant were negligent, and that such negligence "was the proximate cause" of Losh's death. Defendant complains, more specifically, that the instruction should have required findings that Losh turned the switch to the off position, that he relied on the inspection, and that he cut into the cable "under what he thought were safe circumstances." It is true, as suggested, that ordinarily the giving of an instruction purporting to cover the whole case and directing a verdict, but omitting an essential element, constitutes prejudicial error. Banta v. Union Pacific R. Co., 362 Mo. 421, 242 S.W.2d 34; McDaniel v. McDaniel, Mo., Banc, 305 S.W.2d 461. But if the instruction merely states some element or elements indefinitely or ambiguously, the defect may be supplied by other instructions. McDaniel, supra. It is true that the submission here might have been more precise had the suggested elements been included affirmatively, but these things actually entered into and became part of the causation. If Losh did not in fact rely on the safety of the wiring and the switch in its then condition and position, his death was not caused by defendant's negligence. Certainly there would be no presumption or fair inference that Losh in-

tended to commit suicide. Atherton v. Kansas City Power & Light Co., 356 Mo. 505, 202 S.W.2d 59, 63. In finding causation, the jury necessarily found a reliance. And, had Losh turned this switch "on," or left it "on"), then defendant's negligence in failing to detect the defective wiring and to warn, could not have been the basis of any reliance on his part. We feel that the omission here, if there be any, is more in the nature of an indefinite or ambiguous submission than of a true omission. We rule the instruction not prejudicial on this ground. Defendant could, of course, have submitted a more specific hypothesis had it desired. Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, 500. On the other phase of the objections, i. e., "proximate cause," we must restrict the objection to the facts of this particular case. Defendant cites, as requiring a definition of the term: Turnbow v. Dunham, 272 Mo. 53, 197 S.W. 103, 107; Mulderig v. St. Louis, K. C. & C. R. Co., 116 Mo.App. 655, 94 S.W. 801, 807; and Mitchell v. Violette, Mo.App., 203 S.W. 218, 220. In Turnbow and Mitchell the instructions are not set out, and in Turnbow three instructions were held erroneous; in Mitchell the instruction in question was apparently misleading as a whole. In Mulderig separate acts of negligence of two defendants were involved and instructed upon; that would necessarily complicate the question of causation. While those cases are critical of the use of such a term without explanation, they are not controlling here. Counsel also argue on this point that defendant should not be deprived "of its right to protection against the negligence of * * * decedent * * *." That, being a matter of contributory negligence, was covered in defendant's instructions. Our rule concerning the duty of plaintiff to negative contributory negligence has been changed recently (Moore v. Ready Mixed Concrete Company, Mo., Banc, 329 S.W.2d 14, and Shepard v. Harris, Mo., Banc, 329 S.W.2d 1). The objection as made here is ambiguous, but if counsel refer to this rule,

the present case falls in line with Moore, supra, and since the instruction complied with the old rule, the case will not be reversed for an error created in retrospect. The argument of insufficient hypothesis of facts is again made on this phase, but we have discussed the only specific omissions suggested. The cited case of Bowman v. Heffron, Mo., 318 S.W.2d 269, is based on facts and upon a submission so different as to require no discussion. We note again the principle of Hooper v. Conrad, supra; if defendant desired an elaboration or definition of "proximate cause" it might have submitted this in an instruction. It not only failed to do so, but it tendered very general submissions of causation in some of its own instructions.

There was no evidence whatever of any intervening, efficient cause operating between the time of defendant's negligence and the death. We cannot speculate that the wiring was tampered with, and all the evidence indicated the contrary. The question of Losh's own negligence was fully submitted in instructions, with an adverse finding by the jury. Stegall's prior negligence would not, in itself, prevent recovery, for defendant's claimed negligence resulted from its very failure to discover the result of Stegall's negligence, and that was specifically hypothesized. It would seem that on the facts submitted any negligence of the defendant would have been a proximate cause, even if not the sole proximate cause. Gaines v. Property Servicing Co., Mo., 276 S.W.2d 169, 173–174. It is generally true that if the facts submitted in an instruction as constituting negligence are necessarily the direct cause of the injury, there is no reversible error in failing to submit the element of proximate causation in the approved manner. Dowell v. City of Hannibal, Mo.App., 200 S.W.2d 546, 556–558 (reversed on other grounds on transfer, 357 Mo. 525, 210 S.W.2d 4); Cornovski v. St. Louis Transit Co., 207 Mo. 263, 106 S.W. 51, 55–56; Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d

223, 227. If the instruction here was erroneous, it was not prejudicial.

The judgment will be affirmed. It is so ordered.

All concur.