JOHN P. THOMPSON v. CITY OF LAMAR, Appellant.—17 S. W. (2d) 960.

Division One, March 29, 1929.

516

518

*E. L. Moore* for appellant.

*T. W. Martin* and *W. M. Bowker* for respondent.

SEDDON, C.—Plaintiff commenced this action to recover damages for personal injuries in the Circuit Court of Barton County, from whence it went on change of venue to the Circuit Court of Vernon County, where the action was tried to a jury, resulting in a unanimous verdict and a judgment in favor of plaintiff in the sum of $10,000. After unsuccessfully moving for a new trial and for arrest of the judgment, the defendant municipal corporation was allowed an appeal to this court.

Plaintiff was injured on August 16, 1922, between 7:30 and eight o'clock in the morning, while engaged in repairing the roof of a building, in the city of Lamar, owned by one J. S. Campbell, and used as a warehouse in connection with a broom factory operated by said Campbell. Plaintiff was injured by coming in contact with the uninsulated wires of an electric lighting and power line, or system, owned and operated by the defendant municipality, and used to conduct the electrical current from the electrical plant owned by said city, to the consumers thereof in said city, and to the broom factory of said Campbell.

The petition charges that the defendant city had erected and maintained a pole, to which were attached three wires, which pole was located about fourteen feet west of the southwest corner of said warehouse building; that said wires extended from a northwesterly direction to said pole, and continued in an easterly direction from said pole, so that the wires strung on said pole had a tendency to pull said pole to the north, towards said warehouse building, and so that the pole was not erect in the ground, but leaned considerably to the north, thereby throwing the wires of defendant's electrical line, attached to said pole, to the north, so that said wires passed over and above the southwest corner of said warehouse building, about eighteen inches or two feet distant from, and above, the roof thereof; that said wires were loose and sagging, and had no insulation of any kind upon them to protect workmen on the roof of said warehouse building who might come in contact with them; that the pole to which said wires were attached was not braced, or guyed, so as to prevent the wires attached thereto from pulling said pole to the north, and thereby causing said wires to pass over and above the said warehouse building; and that such conditions had existed for such a length of time that the defendant city knew, or could have known, of such conditions in time to have remedied the same. The petition further avers: "Plaintiff says that on the 16th day of August, 1922, and prior thereto, plaintiff was in the employ of the said J. S. Campbell, and under such employment it became and was his duty to go upon the roof of said building or warehouse, to repair the roof thereof. Plaintiff says that the roof of said building was covered by strips of rubberoid roofing running across the roof thereof in an easterly and westerly direction; that, under his employment in working on said building, he worked on said roof from the east to the west side thereof, near the southwest corner thereof, repairing said rubberoid roofing; that he saw the wires of defendant's said electric line, but he did not know whether they carried a current of electricity or not, but that he was constantly careful not to come in contact with them; that, as he finished working on a particular portion of said roof, near the southwest corner thereof, he stood up and started to turn around, so as to face the north to continue his work of repairing said roof, and just at that instant a sudden gust of wind came from the southwest and suddenly whipped said wires against plaintiff's body and limbs, and as a result thereof, he was instantly rendered unconscious.

"Plaintiff says that the roof of said building, at the eaves on the south side thereof, was about fifteen feet from the ground, and that sometime after plaintiff was struck by said wires, as aforesaid, he regained consciousness, and found himself lying on the ground just south of said building, where he had fallen or rolled off of said roof in his unconscious condition.

"Plaintiff says that he was injured as hereinafter set forth on account of the fact that said wires, charged with a current of electricity of high and dangerous voltage, came in contact with his body and limbs as aforesaid.

"Plaintiff says that his injuries as hereinafter set forth were due to, and occasioned, solely by the negligence of the defendant in keeping and maintaining said wires carrying an electric current of high and dangerous voltage in close proximity to said warehouse building and the roof thereof, and in so stringing said wires on said pole as to cause said wires to pull said pole to the north, thus pulling said wires over the roof of said building, and in using wires carrying a current of electricity of high and dangerous voltage without any insulation whatsoever covering said wires, and in allowing said wires to become loose and sagging so as to sway with varying winds."

The answer admits that defendant is a city of the fourth class under the laws of this State, and is, and was at all times mentioned in the petition, the owner of an electrical lighting and power plant and system, operated by defendant, and of the poles, lines and wires used by the said city to conduct and carry currents of electricity to the consumers thereof in said city, which plant and system was a combined waterworks and electrical light and power plant, owned and operated for the use and benefit of said city and its inhabitants, and using the same engines, boilers and equipment to furnish water, light and power for all the various uses and purposes which such a city and its inhabitants would have, including fire protection, the flushing of sewers and gutters, lighting streets and other public places, and for all usual requirements of home and business; wherefore, if plaintiff was injured, as alleged in the petition, on any of the wires, or other equipment, belonging to defendant, such wires and equipment were then and there a necessary part of such combined waterworks and electrical light and power plant and system, and therefore defendant is not liable in damages for injuries caused thereby, because of the provisions of Sections 9111, 9119 and 9121, of the Revised Statutes of Missouri, 1919. The answer denies generally each and every other allegation of the petition, and pleads contributory negligence and assumption of the risk on the part of plaintiff as barring his recovery. The answer furthermore avers that "most of the plaintiff's pain, medical expense, and loss of time, if any, was due to improper and mistaken surgical treatment and his own carelessness."

The reply is a general denial.

It was admitted by defendant, on the trial of the action, that the wires in question were uninsulated and had never been insulated. The uncontroverted evidence was that the wires were known as No. 9 wires, and that they carried an electrical current of 2300 volts, which, according to the testimony of one of defendant's witnesses,

was "not of necessity a deadly current, and would not of necessity burn you," but which was capable of burning, and of killing, one who came in contact with wires carrying such voltage, if the person, by contact with two, or more, of the wires, completed an electrical circuit. The evidence was somewhat sharply conflicting as to the exact location of the wires with respect to the roof of the warehouse building upon which plaintiff was working at the time of his injury, and with respect to their projection over and across the southwest corner of the roof. The testimony of plaintiff, and of several of his witnesses, was to the effect that defendant had placed, and had maintained for a considerable time, a pole which was located about twelve to fifteen feet west of the southwest corner of the warehouse building owned by J. S. Campbell, and which was used as a part of his broom factory; that there was a cross-arm fastened to said pole, which cross-arm extended north and south, and was from two feet to thirty inches in length; that three wires were attached to the pole, one wire being attached to each end of the cross-arm, and the third wire being fastened to a glass insulator at the top of the pole, some four inches, or more above the cross-arm; that the three wires extended from the northwest to the said pole at an angle (the degree of which angle is not definitely shown in the record), and extended from said pole in a slightly south of east direction to another pole, located east of the warehouse building near the office and broom factory building, which was located across the street from the warehouse building; that the two poles were from ninety-two to ninety-five feet apart; that the pole nearest the southwest corner of the warehouse building was not secured in the ground by a guy wire, but was loose in the ground, so that it leaned, or swayed, toward the north a distance of eighteen inches to two feet at the top of the pole, thereby throwing the wires fastened to the cross-arm of the pole across and above the southwest corner of the roof of the warehouse building; that the wire fastened to the north end of the cross-arm extended over and across the southwest corner of the roof of the warehouse building about eighteen inches to two and one-half feet, and that the middle wire also extended over and across the southwest corner of the roof, but not quite so far as the north wire, and that the wire fastened to the south end of the cross-arm extended "just over the edge of the eave" of the roof of the warehouse building; that all of the three wires were loose and sagging, and that the three wires were hanging about two to three feet above the level of the roof of the warehouse building; that the roof of the warehouse building was practically flat, having a very slight pitch, and the dimensions of the roof were approximately fifty by sixty feet.

The evidence of defendant tended to show that a guy wire was fastened to the pole at the time of its erection, and that no changes

were made in the existing conditions respecting the pole and the wires thereon from the time of plaintiff's injury until shortly before the trial of the present action, when all the poles and wires in the vicinity of the warehouse building were removed and replaced because of a fire or conflagration in a building nearby; that measurements were taken by defendant in 1924, some two years after plaintiff's injury, and before the removal and replacement of the poles and wires, showing that the north wire overhung the edge of the warehouse roof by only two inches—"just cutting off the corner"—and was thirty-nine inches above the level of the roof; that the middle wire was ten inches beyond and outside the edge of the roof and six inches above the level of the roof; and that the third, or south, wire was forty-two inches beyond and outside the edge of the roof, and was thirty-nine inches above the level of the roof; that the middle wire had never been fastened to the top of the pole, but had always been fastened to a bracket about twenty-four inches below the crossarm which carried the other two wires; that, in order to complete an electrical circuit, it is necessary for a person to come in contact with two, or more, wires at the same instant; that the distance between the pole nearest the southwest corner of the warehouse building and the pole east, or southeast, of the warehouse building was about 148 feet; and that bare, instead of insulated, wires were used by defendant, because (according to the testimony of defendant's superintendent) "outdoors, on a 2300-volt line, insulation doesn't amount to much; it couldn't be depended on at all; it soon wears off and rolls under; it really will not stand, the water proof wire; they have not found one yet to stand."

Other than plaintiff, there was no eyewitness of plaintiff's injury, or the manner of his injury. Plaintiff testified, on direct examination: "I was doing some work for J. S. Campbell, or the Lamar Broom Works, some repairing on his buildings down there; I began on the 14th of August repairing the rubberoid roofing on the main (factory) building, and, as soon as I got that repaired, I painted that during the balance of that day and the next day and a few minutes on the morning of the 16th, and, as soon as I got that work done, I immediately took my ladder that I was using to climb up and down, and moved over to what is known as his warehouse, west of the office across the street. We climbed upon that [warehouse] building, by placing the ladder at the southeast corner of the building, and examined the entire roof of that building. . . . The first thing I did was to drive a few regular rubberoid roofing nails along the eave of the building where they were loose—and some of them were entirely out, and I was replacing them with new nails. And when I got to the southwest corner I stepped to the seam above, which would probably be a matter—well, one width of rubberoid—I don't know

exactly the width of it—and I started back on that seam—that was the first seam on the building—and I went just a matter of a very few feet, probably five feet, and I didn't have any more nails up there. So I climbed down off of the building then and went to the office and got me that paper sack of nails, and I went back up there and went to work again, beginning at the southeast corner and going west until I came in contact with the place where I had repaired on the first seam, and the wind was extremely high, and I was taking particular notice of that wind. I had been working on the main [factory] building where I noticed these same wires passed over that roof; and I had worked there for a matter, you might say, of two whole days, in close proximity to these wires, and exercising judgment sufficient, at all times, to keep away from those wires, and never dreamed, at any time, of ever coming in personal contact with any of them. And when I looked, just a moment, to see the condition of things, the wires, and noticing the effect of the wind and various things on the wires, and the pole slant, I turned and faced the northwest, with a view of stepping up to the next lap, or seam, and to get back east; and just as I turned—I got, I suppose, facing the northwest—and there was a very heavy gust of wind from the southwest; the wires were on the south side of me; and something, that I didn't have the least idea, made some kind of a noise, and in one second's time that noise was all gone, so far as I was concerned, and the next thing that I knew anything at all about I found myself on the ground in a very serious condition. . . . The building where I was hurt had what was called a cave roof, slanting both ways, and it didn't have very much fall on either side; it was flat enough so you could walk anywhere on it without any danger of slipping or falling off, anything of that nature. I had worked across with one thickness, or one width, of rubberoid roofing; that is, from the eave over as far as the first lap would extend; my impression is it was about thirty inches wide without any lap; it was lapped some; there was nothing else, no other wires or obstruction passing over this roof, except the three wires that I have described." Cross-examination: "When I began working, I began at the southeast corner of the roof, several feet from the wires; they were not near the southeast corner; I was just tacking the rubberoid. I began tacking along the eave or edge of the roof; I continued clear on through near the southwest corner, and stopped a distance of six or eight feet from it; I didn't do any more work farther on because the wires, I didn't like their position, and I didn't care to get any closer than I had gotten; and then I went to the north edge on the first width of lapping; it was about thirty inches wide, and the piece above lapped over some; and I began on that, at the west end, going east; so I did no tacking from something like seven or eight feet from the corner, the southwest

corner where the wires were; I hadn't begun painting at all on that building; I finished working along the eaves then, all I thought would be safe for me to do, at the time I was injured. In working at the first seam from the edge something over two feet, I had my back to the west, facing east, following along the seam; I ran out of nails something like five or six feet from the west edge; then I went down and got the nails, and came from the east, following that same seam, and when I got back to the place where I ran out of nails I was facing the west, and about five or six feet from the west edge of the building; the wires were to my left, and the closest one was something like half way across the width of the rubberoid. My face, I turned, first facing the south; and the wind was blowing pretty heavily, and those wires were swinging a little; and I observed that pole was bending back and forth, that way, and caused the wires to swing; and, besides, the wires were just a little bit slack; and, when I felt sure everything was perfectly safe, I turned facing the west. I turned facing the west to step up to the next seam, so I could commence at the west end and go back to the east end. I turned facing the south, because the wind was blowing pretty heavily, and I raised up, facing straight south, and stood there for as much as a minute— maybe a little bit more. Q. Why were you just standing there? A. I was just looking to see what effect it would have on the swinging wires. Q. You saw they were swinging? A. Yes, sir. Q. Something like eighteen inches from you, and you stood there to see the effect on them? A. I didn't think they were any nearer me than that. Q. They must have swung, then, at least a distance of eighteen inches to touch you? A. Well, across that rubberoid. I think, at the corner, they were anywhere from eighteen inches to two feet over the building. I was just a little east of the corner—probably five feet. Q. You were, at that time, at the very nearest point that you would ever be, in your work, to these wires, when you arose to your feet? A. When I was at the extreme west end. . . . When I started back to the west end to begin, I would be just a little nearer the wires than I was at that time; so, when I turned with my face— when my face was to the south and I turned facing to the west, I would possibly be, in making the turn, just a little bit further west than I was before I made the turn; that would throw me just a little nearer the wires. Q. When you should have got to the second seam, which was your objective, you were not near the wires? A. I never got there. Q. There is where you aimed to go, and you would have been in the safest place, further removed from the danger? A. Yes. Q. When you stopped work, why didn't you immediately, without rising to your feet and stopping to observe the wires, crawl to the second seam where you were to work, and thereby be entirely removed from danger? A. Because the wind was blowing so hard, and

I had been bending over, and it was miserably hot. I thought I would raise up and get a fresh breath and see what condition things were in; and I gradually done so. Q. You had been observing for two days what condition things were in? A. Not in regard to the wind. Q. To the wires? A. Yes; longer than that, as far as the wires. Q. If you were then to begin your next work further removed from the scene of danger, why should you care anything about the wind? Just get out of the way, and if anything— A. When I saw the wires swinging, I just thought I would observe the distance of how far they would probably move. Q. In a sort of experimental mood? A. Not necessarily experimental, no. I just wanted to feel sure that I was clear away from where there was any danger at all. . . . Q. And you were watching and observing those wires so closely that day because you thought they would be dangerous? A. Well, I was sure, if they were carrying a current that day, they would be dangerous. Q. You knew that they were wires that ran into the factory? A. Yes, sir. Q. And supplied the factory with electricity? A. Yes, sir. Q. And, therefore, it was because of their dangerous condition you were watching them? A. Yes, sir. . . . When I went down there to see Mr. Campbell about when he would be ready for his work to be done was when I observed this pole and these wires. That was more than a month before I began these three days work; he showed me the work he wanted done; and then I began observing these wires; I noticed a number of wires running over his buildings, and saw their position; the work to be done was retacking the rubberoid where needed, and painting it, and it had to be patched in several places. I began work on the 14th, and was hurt on the 16th, and prior to that I had been observing these wires and how they passed over the roof, getting ready for the work I was to do.''

Several employees of the broom factory testified as witnesses on behalf of plaintiff. Their testimony tended to corroborate plaintiff as to the condition and location of the pole nearest the warehouse building, and of the wires attached to, and leading from, said pole; that two of said wires passed across and above the southwest corner of the roof of the warehouse building, and that the wires were sagging; that the eave of the roof of the warehouse building was about sixteen or seventeen feet above the level of the ground; and that there was a south breeze blowing on the morning of plaintiff's injury. They testified further that they heard, or saw, the wires leading to the factory building shake violently, which attracted their attention, and, upon investigating, they saw plaintiff lying upon the ground about five or six feet from the southwest corner of the warehouse building, and beckoning to them to come to his aid.

Plaintiff was very severely and seriously injured. His injuries consisted of a number of electrical burns on the body, limbs and fingers of the hands, and both legs were broken. He suffered a very

deep burn on the thigh of the left leg about five or six inches long, and about two and one-half inches wide; another deep burn on the fore part of the left leg below the thigh, about four or five inches long and about two inches wide; besides suffering several burns on the right wrist, the third finger and the thumb of the right hand, the left arm, and the little finger of the left hand. The femur bone of the right thigh, about three to five inches below the hip joint, was broken in two, and the smaller bone of the left leg, below the knee, was fractured. The fractures of the bones doubtless resulted from plaintiff's fall from the roof of the warehouse building to the ground. He was removed to a local hospital for treatment, but the local surgeons were unwilling to assume or undertake the reduction of the fractures, because of the serious nature thereof, and a surgeon was summoned from Joplin to attend plaintiff. Plaintiff remained in the local hospital for nine weeks, when it was discovered that there was no union of the femur, or thigh bone, and he was taken to a hospital in Joplin, where fragments of the thigh bone were cut out with an electrical saw, and the two broken ends of the right femur were fastened together. He remained in the Joplin hospital for a period of nine weeks, when he was removed to his home in Lamar. He was confined to bed for a period of seven months, much of which time he was kept under opiates, because of the excruciating pain of his injuries. Nine months after his injury he was able to take only a few steps about his room, and at the time of trial, in October, 1925, more than three years after his injury, he was walking with the aid of crutches. The evidence tended to show that his surgical, hospital and other expenditures amounted to approximately $800, or more.

Plaintiff was sixty years of age at the time of his injury, and weighed about 180 pounds, and, at the time of trial, he weighed ten pounds less. He had enjoyed good health prior to his injury, and had been earning from $3 to $5 a day. Plaintiff, and several of his family, testified that he had never suffered from dizziness or fainting spells. Plaintiff's physicians expressed the opinion that plaintiff will be permanently crippled as the result of his injuries.

I. The appellant municipality assigns error in the refusal of the trial court to sustain a demurrer to the evidence, requested at the close of all the evidence. Appellant urges that any city, town or village in the State is relieved and exempted from actionable liability for negligence in the operation of an electric light and power plant, or system, by Article 28 (Sections 9079 to 9122, inclusive) of the Revised Statutes of Missouri of 1919, and particularly by reason of Sections 9111 and 9119, Revised Statutes 1919, which are a part of said article. The article, in substance, empowers and authorizes any city, town or village in the State to

purchase, acquire, erect, maintain and operate waterworks, gas and power plants, electric light plants, ice plants, or any other kind of plant or device for lighting purposes, and to supply the inhabitants thereof with water, light, ice and power therefrom. Section 9119 provides: "The city shall not be held liable in any suit at law or in equity on account of any alleged negligence in the *operation* of the waterworks plant, but the city and the board of waterworks commissioners and the property of the waterworks system shall be exempt from any such liability; . . ." Section 9111 provides: "All the provisions of Sections 9079 to 9122, inclusive, which concern the *purchase* of waterworks, shall apply, so far as the same is [are] applicable, to the *erection or purchase* of electric light plants, gas plants, ice plants or other lighting plants." [Italics our own.] Section 9119, supra, was enacted by the General Assembly in 1905 (Laws 1905, page 85). Section 9111, supra, was originally enacted by the General Assembly in 1905 (Laws 1905, page 85), and, as originally enacted, read as follows: "All the provisions of Sections 9924 to 9946, inclusive [R. S. 1909], which concern the *purchase* of waterworks shall apply, so far as the same are applicable, to the *erection* of waterworks, as provided in Sections 9932, 9933, 9934 and 9435 [R. S. 1909]." The said section as originally enacted was repealed in 1919 (Laws 1919, p. 602), and a new section was enacted in lieu thereof, which new section (Sec. 9111, R. S. 1919) reads as above quoted.

Appellant argues that the intent of the General Assembly, in repealing the former section of the statute, and in enacting in lieu thereof the new Section 9111, Revised Statutes 1919, was to extend the municipality's exemption from liability for negligence in the *operation* of a *waterworks* plant or system, as provided in Section 9119, supra, to municipally operated electric light and power plants. It is true, as stated by appellant, that this court, en banc, in State ex rel. v. Hackman, 274 Mo. 551, has held that the several sections of the statute now comprising Article 28, of the Revised Statutes of 1919, must be read *in pari materia,* but the proceeding there in hand was one in mandamus, and involved, as the main question, the right or power of a municipality, under the existing statutes and constitutional provisions, to incur an indebtedness for the *purchase* of an electrical plant. While we held therein that the obvious purpose of the statute was to foster municipal ownership of public utilities, yet the proceeding then before us in no wise involved the question of the municipality's actionable liability for negligence in the *operation* of such utilities. Section 9119, in exempting a municipality from actionable liability for negligence respecting waterworks plants, uses the word "*operation*," whereas the new Section 9111, enacted in 1919, uses the words "*erection or purchase,*" in providing that the provisions of the several sections of the article, "which concern the *purchase* of waterworks," shall apply, so far as the same are ap-

plicable, to electric light plants and other public utilities. Had it been the intent of the General Assembly, in enacting new Section 9111, to exempt municipalities from actionable liability for negligence in the *operation* of electric light and power plants, as in the case of the *operation* of waterworks plants (as provided in Sec. 9119), it is clear to our minds that the law-making body of the State would have used the word "operation," instead of, or in addition to, the words "erection or purchase," in enacting Section 9111. If this court should read into Section 9111 the word "operation," the ordinary meaning and acceptation of which word has no use or connection with the words "erection or purchase," used in said section, we would be reading into the said section, by judicial construction, a word of distinctive use, meaning and acceptation which the legislative body did not see fit to incorporate in said section of the statute. While it is our duty, in construing a statute, to endeavor to ascertain, and to carry out, if possible, the true intent and purpose of the Legislature in enacting such statute, yet we have no right to alter, amend, change, or add to, the statute, by supplying omitted words or phrases, under the guise of construction, especially where the statute is not ambiguous or uncertain in the words, language and form in which it was enacted by the Legislature. [36 Cyc. 1103.] As pointedly said by LAMM, P. J., speaking for this court in Clark v. Railroad Co., 219 Mo. 524, 534: "Courts have no right, by construction, to substitute their ideas of legislative intent for that unmistakably held by the Legislature and unmistakably expressed in legislative words. *Expressum facit cessare tacitum.* We must not interpret where there is no need of it."

Notwithstanding the fact that municipally owned and operated electric light and power plants are deemed to be operated for the benefit of the public, and for the public welfare, as argued by the appellant herein, nevertheless this court has expressly held that "cities undertaking to run [i. e., *operate*] the lighting business must assume the same responsibilities as private persons and private corporations running [operating] like plants." [Riley v. City of Independence, 258 Mo. 671, 681.] We find no clear or certain evidence of legislative intent, in the several sections of the statute relied upon by appellant, that a city operating an electric light and power plant and system is exempted from actionable liability for negligence in the operation of such a plant and system, and hence, under our ruling in the Riley case, supra, the appellant must be held to the same responsibilities, and to the same actionable liability for negligence, as individuals and private corporations operating like electric plants and systems. A municipality, in the exercise of its corporate powers, acts in a dual capacity; on the one hand, it acts in a sovereign, or governmental, capacity, for which it may not be called to respond in damages in a

suit or action; on the other hand, it may act in a proprietary capacity, and, while so acting, it is deemed to act as a private enterprise, and therefore becomes actionably responsible as such, although the emoluments from such enterprise redound to the public benefit. [Public Service Commission v. City of Kirkwood (Mo. Sup. Div. 2), 4 S. W. (2d) 773, 775; South Carolina v. United States, 199 U. S. 437.] The point that appellant is exempt from actionable liability herein must be denied.

Appellant insists that the testimony of plaintiff convicts him of contributory negligence as a matter of law, and, furthermore, that, according to plaintiff's own testimony, the danger of injury from the uninsulated and slack electric wires was so obviously glaring and imminent that plaintiff must be held to have assumed the risk of injury as a matter of law; hence, appellant urges that the demurrer to the evidence should have been sustained by the trial court upon each of those grounds. Ordinarily, the term ''assumption of risk'' is applied to the relation of master and servant, and is referable to a contract of employment, either express or implied, by which the servant agrees with his master that the dangers ordinarily or obviously incident to the discharge of his duty in the particular employment shall be at his own risk. No such relation existed between the plaintiff and the defendant herein, for plaintiff was not in the employ of defendant, but of Campbell, the owner of the warehouse building. But, regardless of whether the defense of assumption of risk is properly applicable herein, such defense is so closely akin to that of contributory negligence that we will consider and treat the two defenses together, as constituting the single defense of contributory negligence.

Appellant, in contending that plaintiff's own testimony convicts him of contributory negligence, as a matter of law, barring his recovery for the injuries sustained, cites a number of decisions of this court, and of the several courts of appeals, as supporting such contention. We have carefully considered and analyzed all of the decisions cited, and we find them to be distinguishable upon the evidentiary facts from the case at bar. Several of the cases thus cited are more favorable to respondent than to appellant, in that the appellate court held therein that the question of contributory negligence was one of fact for the determination of a jury. Among the several cases cited by appellant, perhaps the most favorable to appellant's contention are Morris v. Light & Power Co., 302 Mo. 475, and Gray v. Light & Power Co. (St. L. C. A.), 282 S. W. 490. The Morris case, supra, was decided by this court, en banc, by a four-to-three vote of its then membership. The majority of this court denied the plaintiff a recovery for his injuries upon the ground that plaintiff's own evidence convicted him of contributory negligence as a

matter of law. According to the opinion of the majority, the evidentiary facts, established by plaintiff's own proof, disclosed that plaintiff was returning from his day's work, about seven o'clock on a summer evening, and saw the end of a live electric wire, emitting intermittent flashes of light, lying upon or near the sidewalk upon which he was walking; he purposely avoided the wire, went to his apartment near at hand, procured a broom, returned to the scene, and, after looking over the situation, he reached out with the brush end of the broom and carefully pushed the wire off the sidewalk, whereupon he warned two children, who were approaching, to avoid the wire, and guided them past the danger and at a safe distance from it; he then returned, broom in hand (seemingly for the purpose of further removing the wire as a source of imminent danger), and, when he was within two feet of the wire, it began to writhe and sizzle, plaintiff having theretofore seen the wire hanging in the branches of a tree and that sparks and fire were coming from it as it touched the tree, whereupon the wire fell from the branches of the tree upon which it was suspended, struck plaintiff in falling, and inflicted the injuries for which he sought recovery. The majority of this court reached the conclusion, from the evidentiary facts thus detailed, that plaintiff fully realized the danger of close approach to the wire, and fully appreciated that danger from the situation existed other than that of touching the wire in the position where it was, and he was therefore chargeable with full knowledge of the danger of the wire falling from the tree and injuring him. In the Gray case, supra, plaintiff's decedent had been an electrician by trade (and therefore well may have been deemed to have had some technical knowledge of the dangers attending the handling of electrical wires and appliances), and was seen to leave his home and cross the street towards the electric wire which was down, upon or near the sidewalk, on the opposite side of the street from decedent's home, and which wire had been emitting sparks and making a sizzling noise for an hour or more before decedent's death; decedent was wearing rubber gloves and was carrying a hatchet or handaxe, and, when he came to the wire, he was seen to stoop and strike or chop it, whereupon he instantly became rigid and fell to the ground. Upon those evidentiary facts, the St. Louis Court of Appeals reached the conclusion that decedent, who was by trade an electrician of four or five years' experience, either saw and knew, or, in the exercise of ordinary care for his own safety, could have seen and known, the danger to be incurred by coming in contact with the wire, and held decedent to have been guilty of contributory negligence as a matter of law. A somewhat similar situation existed in Frauenthal v. Laclede Gaslight Co., 67 Mo. App. 1, cited and relied on by the appellant, wherein a young man, although warned to leave a fallen electric wire alone and not to come in con-

tact with it, nevertheless wrapped a hankerchief around his hand, took hold of the wire, and was killed by the electrical shock.

In the instant case, while it is true that plaintiff's own testimony indicates that he knew that the wires were bare and uninsulated, and that the pole which supported them leaned or swayed toward the corner of the warehouse building, thereby throwing the wires over and across the corner of the building, and that the wires were loose and sagging and "swinging a little," yet he testified that he was endeavoring at all times in his work to keep at a safe distance from the wires and to avoid coming in contact with them. Plaintiff had the right to be at work upon the roof of the warehouse building and in close proximity to the wires. While, in the course of his work, he stood erect, according to his testimony, for as much as a minute, or more, facing the wires, in order to "see the condition of things," and to see "what effect the wind would have on the swinging wires," he says that he stood at a distance of eighteen inches, or more, from the wires, where he "felt sure everything was perfectly safe." While it well may be assumed that plaintiff, who apparently is a man of mature years and of average intelligence, knew and appreciated the danger of coming in actual contact with the uninsulated wires if they were carrying a high voltage of electrical current, yet we cannot properly assume from his own testimony, or from any other evidence in the record before us, that plaintiff knew, or reasonably should have known, that the wind was likely to blow the wires across the intervening space of eighteen inches and into contact with his body, or that he fully appreciated the danger of the wind blowing the wires across the intervening space and against his body; nor can it well be said, we think, that the danger of the wind blowing the wires eighteen inches, or more, against the body of plaintiff was so obviously glaring and imminent that plaintiff must be held to be conclusively chargeable with full knowledge and appreciation of such danger. We are of the opinion that plaintiff cannot be held to have been guilty of contributory negligence as a matter of law, but that the question of his contributory negligence was one of fact, which was properly submissible to, and determinable by, a jury. [Smith v. Railway, Light, Heat & Power Co., 310 Mo. 469; Choka v. Railway, Light, Heat & Power Co., 303 Mo. 132; Hill v. Electric Light & Power Co., 260 Mo. 43; Geismann v. Electric Co., 173 Mo. 654; Hollis v. Light & Power Co., 204 Mo. App. 297; Winkelman v. Electric Light Co., 110 Mo. App. 184; Sprinkles v. Utilities Co. (Mo. App.), 183 S. W. 1072; Sanders v. City of Carthage (Mo. App.), 9 S. W. (2d) 813.]

Appellant insists, furthermore, that the evidence does not show whether the wires blew against plaintiff, or whether he became dizzy or faint from the heat of the August morning, while he was working on the flat rubberoid roof under the direct rays of the summer sun, and toppled against the wires; and

hence appellant argues that the exact cause of the accident is a matter of mere guess and conjecture, and, where the evidence is just as consistent with the inference that plaintiff's injury may have been produced by a cause for which appellant is not actionably liable as that his injury may have been caused by appellant's negligent act, to allow the case to go to a jury would be to accord the jury the right to make an arbitrary choice between equally probable, but unproved, conclusions. The rule of law as stated and contended for by appellant is well established in the jurisprudence of this State, but the rule has application only in the absence of any substantial evidence bearing upon the cause of the injury, and where the cause of injury is purely and solely one of mere guess and conjecture. Such was the state of the evidence in Byerly v. Light, Power & Ice Co., 130 Mo. App. 593, cited by appellant herein as supporting the application of the rule just stated, in which case plaintiff's decedent was found dead on a pile of mine tailings in close proximity to defendant's high tension electrical power line, which passed only a few feet above the pile of tailings. Decedent bore on his forehead an incised wound, or gash, indicating that he had fallen forward and had struck his head violently on the sharp edge of a flume, or of the shovel which he was using, and his mouth was filled with the wet tailings. Neither his body nor his clothing bore evidence of an electrical burn. It was therefore held by the Kansas City Court of Appeals that the cause of decedent's fall was purely conjectural under the evidentiary facts, and that plaintiff had failed to sustain the burden of proving the negligence of defendant, as pleaded, which pleaded negligence was that defendant had permitted and maintained its uninsulated electric wires, carrying a dangerous voltage of electricity, to fall or sag over and across the pile of tailings, and thereby to come in contact with decedent. Other cases cited and relied upon by appellant fall within the same category.

In the present case, however, it cannot be gainsaid that plaintiff came in contact with defendant's electric wires, for he bore upon his body some six or seven electrical burns, indisputable evidence of contact with the wires, which, according to the uncontroverted evidence, were the only wires in proximity to the place where plaintiff was injured. On the other hand, there is not a scintilla of evidence that plaintiff was overcome by the heat, or that he became dizzy and faint, and toppled into the wires. While appellant's superintendent testified that "he had a conversation with the plaintiff's son, Bob Thompson, in which he said that his father must have become dizzy or unbalanced and fallen into the wires," yet the plaintiff's son, Robert Thompson, testified that he remembered no such conversation. Plaintiff, and the several members of his family, all testified quite positively that plaintiff had never suffered from dizziness or fainting spells.

Thus, whether plaintiff became dizzy, or faint, and fell or toppled against the wires is merely a guess or conjecture, unsupported by any substantial evidence whatsoever, or by even a scintilla of evidence, and a jury would not have been warranted in basing a verdict for defendant upon any such hypothesis. Furthermore, had there been any substantial evidence that plaintiff had slipped, or become dizzy or faint, and fallen against the wires (and there is none), such evidence would not have relieved appellant of actionable liability herein, for the proximate cause of plaintiff's injury was not his slipping and falling, whether from dizziness, faintness, or otherwise, but the negligent use and maintenance of the appellant's uninsulated and sagging electric wires at, and in dangerous proximity to, a place where plaintiff had a lawful right to work, and where appellant was bound to anticipate that plaintiff might be required to work. [Williams v. Gas & Electric Co., 274 Mo. 1, 12, and cases there cited; Northern v. Fisheries Co. (Mo. Sup.), 8 S. W. (2d) 982, 991; Trout v. Gaslight Co., 151 Mo. App. 207, 227; Musick v. Packing Co., 58 Mo. App. 322, 333; Thompson v. City of Slater (Mo. App.), 197 Mo. App. 247, 260.] But even if there were substantial evidence that plaintiff's injury had occurred in one of two, or more, ways, such evidence does not present a case of mere guess or conjecture. [Conner v. Railway Co., 181 Mo. 397, 411; Solomon v. Light & Power Co., 303 Mo. 622, 640.] In the Conner case, supra, we said: "If there is substantial evidence tending to show that an accident occurred in any one of two or more ways, or any other number of ways, while the burden rests upon the plaintiff to establish such cause of the accident as would render the defendant liable, it by no means presents a case of mere conjecture, but is a question of fact, which should be submitted and determined by the triers of the facts. We only enter the field of conjecture in the absence of proof; when proof enters, conjecture disappears."

Lastly, it is urged by appellant that the demurrer to the evidence should have been sustained because the plaintiff's evidence is contrary to physical law in that it was physically impossible for two of defendant's wires to have been blown by the wind against plaintiff at the same instant of time. However, it requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue, and this court has ruled, in effect, that the testimony of a witness may be rejected upon the legal conclusion that such testimony is opposed to physical law only when such legal conclusion is so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other conclusion. [Kibble v. Railroad Co., 285 Mo. 603, 618; Schupback v. Meshevsky (Mo. Sup.), 300 S. W. 465, 467, and cases there cited.] The testimony in the instant case is not such that we can conclusively or positively say with certitude, from our own experience

and observation, or from our knowledge of any well-established and indisputable physical law, that plaintiff's injury could not have occurred in the manner, and from the cause, as testified by plaintiff and his witnesses.

We think the cause was properly submissible to the jury upon the pleadings and under the evidence educed, and that the learned trial court rightly denied the demurrer to the evidence, interposed by the defendant and appellant at the close of all the evidence.

II. Appellant assigns error in the giving and refusal of certain instructions. Complaint is made against plaintiff's given Instruction 1, which reads:

"The court instructs the jury that if you shall find and believe from the evidence that on and prior to the 16th day of August, 1922, certain electric wires of defendant, carrying a high and dangerous current of electricity, passed over and a short distance above the roof of a certain warehouse of J. S. Campbell and that the roof of said warehouse was a place where persons might reasonably be expected to be for the purpose of making repairs on such roof or for other lawful purposes, then it was the duty of the defendant to keep said wires so stretched as to make them taut so that they would not sag or sway in the wind and to keep said wires so insulated or otherwise protected as to prevent injury to persons coming in contact therewith, and to keep said wires at such a distance that workmen on such roof, or others lawfully thereon, would not be liable to come in contact with said wires; and if you shall further find from the evidence that said wires were loose and sagging or were wholly uninsulated and so passed over the roof of said warehouse that workmen, or other persons lawfully on said roof, might come in contact therewith; and that plaintiff, on said 16th day of August, 1922, was in the employ of said Campbell, engaged in repairing the roof of said building and, by reason of such employment, was required to be and work near where said wires passed over and above the roof of said building; and that there was then passing through said wires an electric current of high and dangerous voltage; and that defendant knew, or by the exercise of ordinary care on its part could have known, of such condition of said wires in time to have remedied such condition before the injuries to plaintiff, if any, shown in evidence, occurred; and that said wires came in contact with or were blown against the body and limbs of plaintiff while he was in the exercise of ordinary care for his own safety; and as a result thereof the electric current passing through said wires was transmitted to the body and limbs of plaintiff and that he thereby received an electric shock and severe burns, and was thereby rendered unconscious; and that as a direct result of such electric shock and burns,

if any, he was precipitated or fell to the ground below and thereby sustained other injuries; then your verdict will be for the plaintiff.''

The said instruction is criticised because it does not require the jury to find that the hypothesized acts or omissions of defendant constituted negligence on its part; wherefore, it is claimed by the appellant that the giving of the instruction, which presented plaintiff's theory of recovery and purported to cover the whole case, and which furthermore authorized and directed a verdict, was reversible error. Appellant has cited a number of decisions of this court, and of the several courts of appeals, which hold that it is prejudicial and reversible error for a plaintiff to submit his case by an instruction which authorizes and directs a verdict upon hypothesized acts or omissions of the defendant without requiring the jury to find that the hypothesized acts or omissions were negligently done, or were negligently omitted to be done, by defendant, and that such an erroneous instruction is not aided, or cured, by other instructions given in the case. But a close reading and analysis of the cited cases discloses that, in each and all of said cases, the hypothesized acts or omissions of defendant did not conclusively constitute negligence on the part of defendant, as a matter of law, but whether defendant was negligent as respecting the hypothesized acts or omissions was a question of fact, determinable by the finding of a jury. The cases thus cited by appellant are these: Hall v. Coal & Coke Co., 260 Mo. 362; State ex rel. v. Ellison, 272 Mo. 571; Lukamiski v. American Steel Foundries, 162 Mo. App. 631; Greenstein v. Iron & Foundry Co. (Mo. App.), 178 S. W. 1179; Cross v. Coal Co. (Mo. App.), 186 S. W. 528; Clark v. Long (Mo. App.), 196 S. W. 409; Ratliff v. Power Co. (Mo. App.), 203 S. W. 232.

The rule announced and applied in the afore-cited cases, however, has no application to the present case, for the reason that, if the jury found (as they did) the existence of the acts or omissions of defendant hypothesized in plaintiff's Instruction No. 1, then, under the decisions of this court, and of the courts of appeals, defendant was guilty of negligence *per se*, or as a matter of law and not of fact, and it would have been wholly useless and unnecessary for the jury to have been required to find that such hypothesized acts or omissions constituted negligence on the part of defendant, entitling plaintiff to a recovery. [Geismann v. Electric Co., 173 Mo. 654, 678; Von Trebra v. Gaslight Co., 209 Mo. 648, 659; Clark v. Railway Co., 234 Mo. 396, 432; Hill v. Light & Power Co., 260 Mo. 43, 78; Williams v. Gas & Electric Co., 274 Mo. 1, 8; Godfrey v. Light & Power Co., 299 Mo. 472, 485; Choka v. Light, Heat & Power Co., 303 Mo. 132, 144; Shannon v. Light & Power Co., 315 Mo. 1136, 1150; Trout v. Gaslight Co., 151 Mo. App. 207, 221; Sprinkles v. Utilities Co. (Mo. App.), 183 S. W. 1072, 1076; Grady v. Light, Power & Traction Co. (Mo.

App.), 253 S. W. 202, 204; Lofty v. Construction Co. (Mo. App.), 256 S. W. 83, 87; Sanders v. City of Carthage (Mo. App.), 9 S. W. (2d) 813, 816.]

In the Geismann case, supra, which is the corner-stone of the law on the subject in this jurisdiction, and which is the foundation of the later rulings that an electric light and power corporation, whether private or municipal, is chargeable with negligence *per se* in maintaining uninsulated, or defectively insulated wires, at a place where it has reason to anticipate that persons may lawfully and rightfully be, and where such persons may likely come in contact with its wires, we said (173 Mo. l. c. 674, et seq.) : "Electricity is one of the most dangerous agencies ever discovered by human science, and owing to that fact it was the duty of the electric light company to use *every protection* which was accessible *to insulate its wires* at all points where people have the right to go, and to use the *utmost care to keep them so;* and for personal injuries to a person in a place where he has a right to be without negligence upon his part contributing directly thereto, it is liable in damages. [McLaughlin v. Louisville Electric Light Co., 100 Ky. 173.] The deceased was, at the time he received the shock which caused his death, in a place where his duty required him to be, and it was the duty of the defendant in the exercise of even ordinary care and foresight to know that sign-hangers, painters, carpenters and other mechanics would be required, as occasion might require of them in the pursuit of their respective occupations, to come in proximity to its wires constructed and maintained on the signs and cornice in front of the building where the accident occurred. [Citing cases.] . . . It follows from these authorities that it was defendant's duty, in the first place, to use *every protection* which was reasonably accessible *to insulate its wires* at the point of contact or injury in this case, and *to use the utmost care to keep them so,* and the fact of the death of Geismann is *conclusive proof* of the defect of the insulation and *negligence of the defendant,* and as to whether he was guilty of contributory negligence or not was a question for the jury." (Italics ours.)

And in the later Choka case, supra, we said (303 Mo. l. c. 144) : "The wires were placed in and around the mill company's building and upon its property. Defendant, when it placed those poles, cross-arms, and wire constructions, was bound to anticipate that at some time work would have to be done upon and around that building, and in the neighborhood of these wires, poles and cross-arms. The very cross-arm upon which the ladder was placed was attached to the building as well as the pole. Its use by workmen must have been anticipated. [Citing cases.] . . . Deceased had the right to be in and around the building in the performance of his work, and defendant was obligated to anticipate that workmen at some time would

be there. Thus arises the duty upon the part of defendant to use the *highest degree of care* to prevent injury to anticipated workers having the right to be in and around its wires.'' (Italics ours.)

The distinction between those cases wherein the hypothesized acts or omissions of a defendant constitute negligence as a matter of law and those wherein such hypothesized acts or omissions of defendant may, or may not, constitute negligence, according as such may be found as an issuable fact by a jury, is readily recognized and clearly expressed by TRIMBLE, J., speaking for the Kansas City Court of Appeals, in Ratliff v. Power Co., 203 S. W. l. c. 235, as follows: ''It is true that in a number of cases it is said the fact of the electric shock is *conclusive proof* of the defect in the insulation and *of the negligence of defendant* (Geismann v. Electric Co., 173 Mo. l. c. 678), or that it will be conclusively presumed that the insulation of the wire was defective. [Von Trebra v. Gaslight Co., 209 Mo. 648, 659; Sprinkles v. Public Utilities Co., 183 S. W. 1072; Trout v. Gaslight Co.; 151 Mo. App. 207; Clark v. Railway Co., 234 Mo. 419.] But in all such cases the wires were so close to where the electric company had reason to believe persons would lawfully go, that the injured party would necessarily come into personal bodily contact with them, and, of course, in such instances, *where the wires were likely to be touched by the body of one coming near them, the electric company was clearly negligent in placing them there, and the fact that the insulation failed to protect and an injury resulted conclusively showed negligence.''* (Italics ours.)

The pleaded and proven facts in the instant case, which facts are hypothesized in the plaintiff's criticised Instruction No. 1, clearly bring the instant case within the category of the cases referred to in Judge TRIMBLE's opinion, just quoted, and within the category of the many cases (following the Geismann case, supra) hereinabove cited. The hypothesized facts, required by plaintiff's Instruction 1 to be found by the jury, constituted negligence *per se,* or as a matter of law, on the part of defendant, and no harm was, or could have been, occasioned to defendant because the trial court did not require and instruct the jury to separately find that those facts constituted negligence. An additional and separate finding by the jury that such hypothesized acts or omissions of defendant constituted negligence would add nothing to what the law itself declares such hypothesized acts or omissions of defendant to be—namely, negligence *per se.* Hence, the criticism leveled against the instruction is not well grounded under the pleaded and established facts in the present case. [Drew v. Railway Co. (Mo. App.), 293 S. W. 468, 471; State ex rel. v. Ellison (Mo. Sup.), 208 S. W. 443.]

Appellant complains of that portion of plaintiff's Instruction 1 which told the jury that ''it was the duty of the defendant to keep

said wires so stretched as to make them taut so that they would not sag or sway in the wind, and to keep said wires so insulated or otherwise protected as to prevent injury to persons coming in contact therewith, and to keep said wires at such a distance that workmen on such roof, or others lawfully thereon, would not be liable to come in contact with said wires.'' It is argued by appellant that it is practically impossible to keep such wires from sagging to some extent, and that such wires are bound to sway in the wind to some extent, but that the instruction told the jury, in effect, that it was the absolute and positive duty of defendant to keep the wires from sagging or swaying in the wind at all, and that, if they sagged or swayed in the wind to any extent whatsoever, then the defendant was actionably liable therefor. It is further argued that the insulation of electric wires is not always necessary, and that the impracticability of keeping and maintaining the insulation on wires exposed to the weather is a well-recognized fact. Hence, appellant claims that whether it was negligent in the respects stated in the instruction was one of fact for the finding and determination of the jury, and not one of law. While we recognize that the terms, or words, "taut," "sag," and "sway," are somewhat relative and comparative terms, yet in their ordinary use and acceptation such terms, or words, have a commonly and well-known meaning and application. The meaning of ordinary words, when used in their usual or conventional sense, need not be explained or defined to the jury, and, if a party to an action believes that a term used by the court in an instruction should be defined and explained to the jury, he should ask for a special instruction defining the term. [38 Cyc. pp. 1686-1689; Quirk v. Elevator Co., 126 Mo. 279, 293; Rattan v. Railway Co., 120 Mo. App. 270, 280.] As used in the instruction, we think the terms, or words, criticised by appellant could not have been misunderstood by the jury, and we do not conceive that the use of such words could in any way have misled the jury. [Sweeney v. Railway Co., 150 Mo. 385, 401.] It was admitted on the trial by the appellant, and all of the evidence bearing thereon is uncontroverted, that the wires with which plaintiff came in contact had never been insulated, but that, from the very time of their erection, the wires had been bare and uninsulated. In all of the cases cited herein, it is held and ruled to be negligence *per se* for an electric light and power corporation to erect and maintain uninsulated, or defectively insulated, wires at a place where it is bound to anticipate that persons may rightfully and lawfully be (as in the instant case) in the discharge of their work and occupation, and where they may likely come in contact with such uninsulated, or defectively insulated, wires.

Appellant furthermore urges that plaintiff's Instruction No. 1 makes defendant an insurer of the safety of plaintiff, whereas, under

the decisions of the appellate courts of this State, it was bound to exercise the "utmost care," as ruled in the Geismann case, supra, or the "highest degree of care," as ruled in the Choka and Shannon cases, supra, to prevent such injuries as befell the plaintiff. Reading and viewing plaintiff's Instruction 1 in its entirety, we think the instruction fairly states the duty and care laid upon an electric light and power corporation by the many decisions of this court, and of the several courts of appeals, above cited, and that the instruction cannot well be said to make the defendant an absolute insurer of plaintiff's safety.

It is also urged that said instruction is erroneous because it wholly fails to require the jury to find that the hypothesized acts or omissions of defendant were the proximate cause of plaintiff's injury. While appellant concedes that the instruction requires a finding by the jury that "said wires came *in contact* with . . . the body and limbs of plaintiff . . .. and *as a result thereof* the electric current passing through said wires was *transmitted* to the body and limbs of plaintiff, and that he *thereby* received an electric shock and burns, and was *thereby* rendered unconscious, and that as a *direct result of such electric shock and burns,* if any, he was precipitated or fell to the ground below and *thereby* sustained other injuries," yet appellant says that "the hiatus of *proximate cause of the contact itself* is nowhere supplied." A like criticism was leveled against an instruction, and ruled adversely by this court, en banc, in State ex rel. v. Ellison, 208 S. W. 443, 444, wherein we held that, "by submitting *seriatim* (and requiring an adverse ruling as to defendants) all of the elements essential to show that the unlighted and negligently placed pile of bricks was the 'efficient' cause of the injury to plaintiff's wife, the jury were necessarily required to find that her injury was the 'proximate' result of defendants' negligent failure to guard, by a warning light, the dangerous obstruction in the street." The criticism made against the instruction is not well grounded.

Lastly, it is urged by appellant that plaintiff's Instruction No. 1 is broader than the petition, in that the petition alleges that "a sudden gust of wind came from the southwest and suddenly whipped said wires against plaintiff's body and limbs," whereas said instruction calls for the finding of the jury that "said wires came in contact with *or* were blown against the body and limbs of plaintiff." Manifestly, the ground of criticism urged does not constitute reversible error, for the obvious reason that the substantive and basic fact of liability, or act of negligence, pleaded in the petition was the use by defendant of "wires carrying a current of electricity of high and dangerous voltage without any insulation whatsoever covering said wires, and in allowing said wires to become

loose and sagging" in close proximity to the roof of the warehouse building, where defendant was bound to anticipate the presence of workmen (such as plaintiff) at some time, and where such workmen were likely to come in contact with such wires. The manner in which the wires came in contact with plaintiff's body, whether by being blown by the wind or otherwise, was but a subsidiary or evidentiary fact, and was not the substantive and ultimate fact upon which defendant's actionable liability is dependent, or for which plaintiff seeks a recovery. Such matters of evidence have no proper place in a pleading, and if, perchance, inadvertently included in the pleading, do not ordinarily, or necessarily, confine the substantive and ultimate negligence pleaded and relied on as the basis of a recovery to the particular evidentiary or subsidiary facts inadvertently pleaded. [Banks v. Morris and Co., 302 Mo. 254, 268; Anderson v. Davis, 314 Mo. 515, 559.]

Appellant assigns error in the giving of plaintiff's Instruction No. 2, on the measure of damages. The instruction told the jury that they might take into consideration in assessing plaintiff's damages "*nursing and care*" on account of his injuries, whereas the petition prays recovery only for "*nursing*" (omitting the word "care") as an element of damage. We regard the criticism as hypercritical to the extreme. The words "nursing" and "care," in their common and ordinary use and acceptation, are synonymous, and are frequently and ordinarily used together in instructions on the measure of damages. We think the jury were not misled thereby, and that they were not led to believe that they might make an additional award of damage for "care," as distinguished from "nursing."

It is also claimed that the instruction was prejudicial and harmful to defendant in that it suggested or invited the jury to return a large and excessive verdict, because it told the jury they might assess plaintiff's damages at such sum as, in their judgment under all the evidence in the case, will compensate him for the injuries received, "not exceeding the sum of $25,000," which is the maximum amount of recovery prayed in the petition. Without approving the giving of instructions on the measure of damages which include a clause limiting the amount of recovery to that prayed in the petition, and while appreciating that the giving of such an instruction may possibly be harmful in some instances, nevertheless we do not find that this court has ruled the giving of such an instruction to be reversible error; on the other hand, where the giving of an instruction in such form has been followed by an excessive verdict, we have been inclined to follow old precedents by declaring that the error can be cured by forced *remittitur*. [Bond v. Railway Co., 315 Mo. 987, 1007.] We cannot

say, however, in view of the fact that the jury awarded plaintiff a compensation of $10,000, rather than accepting the (claimed) invitation or suggestion to allow him two and a half times that amount, as authorized by the instruction, that the instruction in the form as given was harmful to the defendant and appellant herein. If it well can be said that such an invitation, or suggestion, was extended to the jury by the form of the instruction, it seems apparent that the jury ignored the invitation, or suggestion, and used their own judgment in arriving at the amount of their verdict. [Stahlberg v. Brandes (Mo. App.), 299 S. W. 836, 837.]

Appellant claims that the giving of plaintiff's Instruction No. 5, which told the jury that "it was the duty of the defendant to protect its wires carrying a powerful and dangerous current of electricity by insulation, or otherwise, and to use a very high degree of care to keep such insulation or protection of such wires in such condition and repair as to make them reasonably safe to those who, in the performance of their duties, might be brought into contact with them," and that a failure to exercise such care constituted negligence, is reversible error because it made the insulation of the wires an absolute duty of defendant, and thereby made defendant an insurer of the safety of the wires. The claim of error must be denied for the same reasons upon which we have denied a like claim of error in the giving of plaintiff's Instruction No. 1.

Error is assigned in the refusal of defendant's Instruction No. 4, which sought to submit the issue of plaintiff's assumption of the risk. As we have heretofore said, the issue of assumption of risk is ordinarily and peculiarly referable to the relation of master and servant, and is based upon contract, express or implied. We deem such issue inapplicable to the present case, for no relation of master and servant, or other contractual relation, existed between plaintiff and defendant city. The instructions given on behalf of both plaintiff and defendant fairly and fully submitted the issue of plaintiff's contributory negligence, and no harm or error was committed by the trial court in refusing defendant's instruction on the issue of assumed risk.

III. Error is assigned in the admission of certain testimony on behalf of plaintiff. Plaintiff's son, Robert Thompson, had testified that he was an alderman of the defendant city, and that he had previously worked for the defendant city as an employee in the electric light and power department of the municipality for a period of one year, and had personally assisted in the erection of the pole, cross-arms and electric wires which had occasioned plaintiff's injury. He was

asked what would have been the proper kind of wire to have used for such purpose, and answered that "they should have used a water-proofed copper—copper wire that was insulated." Objection was made by defendant that the answer was a conclusion of the witness, and that witness was not qualified to express an opinion in the matter, and the objection was overruled by the trial court. The witness had had one year of experience as an electric lineman, and the matter of his qualification to express an opinion in the matter of inquiry was largely within the discretion of the trial court. [Adams v. Railroad Co., 287 Mo. 535, 551.] But, in any view, the admission of the testimony was harmless, inasmuch as the appellate courts of this State have repeatedly ruled, in the cases cited supra, that it is the duty of an electric light and power company, in the exercise of the highest or utmost degree of care required of it, to keep such wires, designed and used to carry a dangerous voltage of electrical current, insulated at places where it is bound to anticipate that persons may lawfully come into close proximity to such wires for purposes of business, or even of pleasure.

Plaintiff's daughter testified as to the nature and extent of her father's injuries, and as to what she did in the way of nursing and caring for her father for several months while he was confined to the hospital and to his home. Much, if not most, of such testimony was given without objection from the defendant. The testimony was properly admissible, we think, for the purpose of showing the nature and extent of plaintiff's injuries, and his pain and suffering therefrom. As a general rule, if testimony is properly admissible for one purpose it cannot be excluded upon the ground that it may not be properly admissible for another purpose. If defendant believed that the testimony should have been limited in its application and effect, it was defendant's duty to have requested the giving of an instruction limiting the application of such testimony, which defendant did not do. [Cazzell v. Schofield (Mo. Sup.), 8 S. W. (2d) 580, 590; Sotebier v. Transit Co., 203 Mo. 702, 721; Standard Milling Co. v. Transit Co., 122 Mo. 258, 273.] Furthermore, appellant does not point out in its brief the particular and precise parts of witness's testimony which it claims should have been excluded. It is not the duty of this court to search the entire testimony of a witness in order to discover, if possible, isolated portions of the testimony which may, or may not, be the subject of appellant's general complaint, but it is the duty of appellant to point us to the particular portion of the testimony complained against, and to the page of the printed abstract of the record where such portion of the testimony may be found. [Cazzell v. Schofield (Mo. Sup.), 8 S. W. (2d) 580, 590, and cases there cited.]

IV. Appellant urges that the amount of the verdict and judgment is excessive. The severe and numerous injuries suffered by plaintiff, the evidence as to the permanency of such injuries, and the long period of plaintiff's total incapacity to perform any kind of work or labor whatsoever, together with the evidence of his intense pain and suffering during the long period of his confinement in the hospital and in his home, and his loss of earnings, all refute such claim of appellant and convince us of the reasonableness, and of the modesty in amount, of the jury's verdict.

V. Finally, it is urged that appellant should have been granted a new trial of the action because the verdict of the jury was a "quotient" verdict. The clerk of the trial court testified as a witness, in support of defendant's motion for new trial, that he was present in the court room when the jury returned their verdict, and, after the jury had handed the verdict, and the papers attached to it, to the judge of the court, the judge handed them to the witness and he attached them to the rolls in the case. Thereupon the witness identified the verdict, and nine pages of foolscap paper purporting to have been attached thereto, as being the papers handed to him by the judge of the trial court, and as being the papers attached by him to the rolls in the case. These ten pages of foolscap paper were offered in evidence by appellant. The first page consisted of the verdict of the jury, which was in proper form and was duly signed and authenticated by the foreman of the jury. The second page was blank. The third page had written thereon the words: "We the jury find the issue for the defendants." (Italics ours.) This writing was unsigned. The fourth page was blank. The fifth page bore the addition of the three numerals 15, 10 and 5, making the aggregate sum of 30. The sixth, seventh, eighth and ninth pages were blank. The tenth page had written thereon the following:

"Plaintiff Defendant"

111 111

Below the foregoing was the mathematical calculation, or addition, of twelve numerals, aggregating 117,500, divided by the divisor 12, leaving the quotient, 9791⅔.

Appellant argues from the foregoing memoranda and evidence that the inference is unavoidable that the jury voted *nine* for plaintiff and *three* for defendant, upon their ballot taken, and then, in order to reach a unanimous agreement, they set down each juror's individual expression, or estimate, of the amount which he thought should be awarded to plaintiff, divided the addition or sum of such numerals by twelve, thereby reaching the quotient 9791⅔, with the

result that the jury adopted the nearest round number, 10,000, as the amount of their verdict. Hence, appellant insists that the verdict falls within the category of gambling, or chance, verdicts, and was not the result of the conscientious and deliberate conviction and judgment of the jury.

Appellant insists that the ''quotient'' verdict is almost universally condemned, and has cited numerous juristic authorities, most of them from foreign jurisdictions, wherein, upon substantial and positive proof, such verdicts have been set aside upon appeal. Our own court has held that a verdict made by virtue of, and pursuant to, a prearranged agreement among the jurors to be bound by the result of the averaging of the individual estimates of the jurors amounts to misconduct on the part of the jury, and ought not to be permitted to stand. [Sharp v. Railway Co., 114 Mo. 94, 106; Sawyer v. Railroad Co., 37 Mo. 241, 264; State v. Branstetter, 65 Mo. 149, 156.] But the vitiating fact appears to be in the mutual agreement of the jurors in advance of their verdict to abide by the unknown and unascertained result, and in the cases just cited this court has ruled that the verdict cannot be impeached by the testimony of any one, or more, of the jurors themselves, but only upon substantial and positive proof of such an agreement *aliunde* the jurors themselves. Hence, BLACK, P. J., in the Sharp case, supra, was impelled to remark, ''In general there is, therefore, no way to prove that a verdict is the result of such an agreement.''

We cannot say with certitude, from the record before us in the present case, that the verdict of the jury was the result of a prearranged and mutual agreement of the jurors in advance of their verdict to be bound by the unascertained result of the averaging of the individual estimates of the jurors. There is no evidence whatsoever that the figures, or mathematical computation, contained on the tenth page, or sheet, of the several sheets of foolscap paper in evidence, were in the handwriting of any member of the jury in the present case. It is just as reasonable to infer from the evidence herein that the jury, upon arriving at a verdict, inadvertently gathered up the loose papers which may have been lying upon a table in the jury room, and that the foreman of the jury inadvertently handed such papers to the trial judge together with the jury's verdict. Several of the papers thus handed to the trial judge were blank, and had nothing whatsoever written thereon, and one paper had written thereon an unsigned form of verdict finding ''the issue for the defendants (there is only one, single, defendant in the instant case). It may have been (and it requires no stretching of the imagination to reasonably infer) that the figures, or mathematical computation, contained on the tenth page, or sheet, of paper in evidence were placed thereon by some member of another and different jury than the

jury in the instant case, and that such mathematical calculation was made in the consideration of another and different case, and that such paper had been left, by another and different jury, lying upon a table in the jury room, and was inadvertently gathered up with other loose papers and handed to the trial judge along with the verdict of the jury in the instant case. Who can undertake to say from the evidence herein except by mere guess or conjecture? Nor is there a scintilla of evidence herein that the jurors agreed in advance of their verdict to adopt the quotient resulting from dividing the aggregate of the numerals set down on the paper by twelve. The sanctity of the jury's deliberations, and the verity and honesty of their verdict, ever since the adoption of our jury system of procedure, has been jealously guarded and maintained by the courts, and properly so, and to overthrow or set aside the verdict of a jury in the absence of convincing, positive, and well nigh conclusive, evidence of misconduct of the jury in arriving at such verdict would amount to an unwarranted and unjustifiable invasion by the court of the jury's province, and would be a long step toward the utter destruction of the jury system of procedure in the trial and determination of actions at law, and would amount to a transgression of Section 28 of Article 2 of our State Constitution, which guarantees that "the right of trial by jury, as heretofore enjoyed, shall remain inviolate."

The evidence in State v. Linn, 223 Mo. 98, 110, was almost identical with that in the instant case, and we therein said: "Finally, it is insisted that the misconduct of the jurors in the method employed by them in arriving at their verdict, is sufficient to justify a reversal of the judgment. In support of this assignment, the record shows that one of the defendant's witnesses testified upon the hearing of a motion for new trial that, about a half or three-quarters of an hour after the verdict was returned and the jury discharged, he found in front of the judge's desk and the jury box a paper, which he identified and offered in evidence, containing a column of twelve figures, ranging from 10 to 35, and twelve numbers had been added and the sum divided by twelve, producing a quotient of twenty-four, this last number corresponding to the number of years at which the jury assessed the defendant's punishment in the penitentiary. No other trial intervened between the return of the verdict in this case and the finding of this paper by the counsel. There was no other evidence offered on this head. There was nothing to indicate that these figures were in the handwriting of any member of the jury and absolutely nothing to indicate that they agreed in advance to adopt as their verdict the quotient resulting from dividing by twelve the aggregate of the numbers set down on said exhibit. . . . The paper exhibit was utterly insufficient to establish any prior agreement by the jurors to be bound by the quotient verdict. Indeed the paper was

not shown to have been an act of any member of the jury, and it is clearly insufficient to overthrow the solemn verdict of the jury."

It is the well established and settled rule in this jurisdiction that a party who attacks a verdict upon the ground that it is a quotient verdict must show that there was a prearrangement among the jurors to accept the unknown and unascertained quotient as their verdict, and the presumption is that there was no such prearrangement among the jurors. [Hagan v. Mining Co., 131 Mo. App. 386, 390; Ownby v. Railways Co. (Mo. App.), 228 S. W. 879, 882; Ingram v. Poston (Mo. App.), 260 S. W..773, 775.] And, if the jurors have not bound themselves beforehand to accept the unascertained quotient as their verdict, but after the quotient is ascertained they adopt it as their verdict, the fact that they fell upon that mode of reaching an agreement will not vitiate their verdict. [Scott v. Railways Co. (Mo. Sup.), 229 S. W. 178, 179, and cases cited.]

We have given careful and thorough consideration to the many assignments of error made by the appellant herein, but our examination of the numerous assignments made, and of the entire record before us, discloses no reversible error. The judgment *nisi* must therefore be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.